FITZGERALD *v.* CHICAGO MILL & LUMBER COMPANY.

Opinion delivered January 30, 1928.

1. MORTGAGES — TRESPASS OF MORTGAGOR IN CUTTING TIMBER. — A mortgagor who cuts, removes and sells timber from the mortgaged property is a trespasser, though the whole proceeds were used in his farming operations and in minor improvements on the land.

2. MORTGAGES—TITLE OF MORTGAGEE.—The legal title to the land passes to the mortgagee, subject to be defeated by the performance of conditions of the mortgage.

3. MORTGAGES—RIGHTS OF MORTGAGOR IN POSSESSION.—The mortgagor in possession of the land is entitled to take the annual crops and wood for fuel, and do any acts in carrying on the farm which are usual and proper in the course of good husbandry.

4. MORTGAGES — WILLFUL TRESPASSER IN REMOVING TIMBER.—The mortgagor, in cutting, removing and selling timber from the mortgaged land without obtaining the consent of the mortgagee, is a willful trespasser acting in bad faith.

5. MORTGAGES—BUYERS OF TIMBER FROM MORTGAGOR—LIABILITY.—
Where a mortgagor was a willful trespasser in selling timber
from mortgaged land, persons buying from him without actual
notice of such .willful trespass, but with constructive notice of
the mortgage lien, are *held* to have placed themselves in the
mortgagor's shoes as to liability for actual damages for con-
version of the timber.

6. MORTGAGES—EFFECT OF REMOVAL OF TIMBER.—Removal of timber
worth $9,000 from mortgaged land *held* to impair the security of
a second mortgagee.

7. MORTGAGES—REMOVAL OF TIMBER—LACHES.—A second mortgagee
was not barred by laches nor estopped by her conduct from mak-
ing claim for the value of timber against the purchasers of tim-
ber removed from the mortgaged property by the mortgagor, and
sold without the mortgagee's knowledge, notwithstanding proof
that the logs were stacked on the river bank before shipment.

8. MORTGAGES—REMOVAL OF TIMBER—BURDEN OF PROOF.—In an action
by a mortgagee against the purchaser of timber cut from mort-
gaged premises, and removed without the mortgagee's knowledge,
the purchaser having constructive notice of the mortgage, *held*
that the buyer has the burden of showing what amount, if any,
of the proceeds of the timber was expended on the mortgaged
property in conformity with good husbandry.

9. MORTGAGES—WRONGFUL REMOVAL OF TIMBER—LIABILITY.—The
mortgagee is entitled to recover against the buyers of timber
from the mortgagor selling same without authority from the
mortgagee the amount paid by them to the mortgagor for tim-
ber sold with interest at the rate of 6 per cent. per annum from
the date of conversion, where the buyers failed to show what
amount, if any, was expended on the premises by the mortgagor in
conformity with good husbandry.

Appeal from Phillips Chancery Court; *A. L. Hutch-
ins,* Chancellor; reversed.

*Gerald Fitzgerald* and *Rose, Hemingway, Cantrell &
Loughborough,* for appellant.

*Moore, Walker & Moore,* for appellee.

WOOD, J.   Mrs. N. R. Fitzgerald instituted an action
against R. L. Cobb and wife in the chancery court of
Phillips County to foreclose a deed of trust executed by
Cobb on a large plantation to secure an indebtedness to
plaintiff of approximately $104,000.   The deed of trust
was subject to a prior deed of trust in favor of the Dem-
ing Investment Company in the sum of $110,000.   The

investment company was made a party defendant, but filed no answer. It was alleged that Cobb, the mortgagor, had wrongfully and unlawfully cut timber from the mortgaged premises and sold the same to the Chicago Mill & Lumber Company, and also cut timber from the mortgaged premises and sold same to the Howe-Neely Lumber Company. The value of the timber alleged to have been sold to the Chicago Mill & Lumber Company was not set forth, and the plaintiff asked that that company be required to produce its books to enable the plaintiff to ascertain the correct value of the timber sold to it. The value of the timber alleged to have been sold to the Howe-Neely Lumber Company was set down at $2,202.47. Judgment of foreclosure was prayed against the mortgagors, R. L. Cobb and wife, and for damages in the sum of three times the value of the timber removed and sold, and against the lumber companies for the value of the timber purchased by them from Cobb.

The only appeal here is by the plaintiff from the decree dismissing her complaint for want of equity as against the lumber companies. Therefore it is unnecessary to set out the answer of Cobb and wife, further than to say it denied that they had wrongfully and unlawfully cut and sold timber to the lumber companies. The Chicago Mill & Lumber Company answered, denying that it had, without lawful authority, purchased timber from Cobb, knowing that it had been cut and removed from the lands described, contrary to law, and denied that any timber sold to it by Cobb was grown on, or removed from, the property described, and denied that the quantity of timber sold to it by Cobb was unknown to the plaintiff, and denied that appellants should recover any amount for the timber. It alleged that it had purchased certain timber in the form of logs from Cobb which had been delivered to it on the west bank of the Mississippi River, in dumps or piles, where it could be conveniently loaded on barges; that it was not responsible for the cutting and hauling of the logs to the river; that, when the logs were thus delivered to it, they were no longer real estate,

but personal property, and the plaintiff had no lien thereon; that the proceeds of the sale of the logs by Cobb were used by him in the making of necessary improvements on the property described in the deed of trust. It was alleged that the plaintiff and Cobb, on the 25th day of November, 1923, entered into a verbal agreement by which Cobb conveyed to the plaintiff the lands involved, the consideration being the release of the deed of trust; that Cobb, pursuant to the agreement, surrendered possession to the plaintiff and tendered a quitclaim deed to plaintiff to the mortgaged premises; that, at the time the verbal agreement was entered into for the surrender of the possession of the premises, the plaintiff knew that the timber had been removed and therefore she was estopped from claiming any damages therefor. It was further alleged that the Deming Investment Company had a prior lien on the mortgaged property in the sum of $121,000, which the plaintiff had not paid, and the failure to satisfy this prior mortgage was pleaded in bar of plaintiff's right to recover against the lumber company. The Chicago Mill & Lumber Company also entered a demurrer to the complaint on the ground that it did not state a cause of action, and also on the ground that the plaintiff had not paid the prior indebtedness to the Deming Investment Company, and therefore had no cause of action for the removal of the timber by the mortgagor, Cobb.

The Howe-Neely Lumber Company answered and admitted that it purchased some logs from Cobb, but denied that the plaintiff had any interest therein, and denied that it was indebted to the plaintiff in the amount prayed. It also denied that the logs purchased by it from Cobb were taken from premises on which the plaintiff had a mortgage. It denied that it had cut logs from any lands owned by plaintiff or Cobb, and alleged that the logs purchased by it from Cobb were delivered by Cobb to the defendant's millyard at Helena.

The plaintiff replied to the answers, and pleaded the statute of frauds to defeat the alleged verbal contract of sale from Cobb to the plaintiff.

The undisputed testimony shows that E. C. Nelson, the local manager of the Chicago Mill & Lumber Company, during the year 1923 purchased for the company from R. L. Cobb logs for which it paid the sum of $16,661.72. These logs were purchased under a written contract between the Chicago Mill & Lumber Company and Cobb, executed May 12, 1923. The logs consisted of cottonwood, gum, maple, and elm, and were to be delivered on the bank of the Mississippi River at or near Westover Landing, within easy reach of derrick boats at all stages of water, and were so delivered from June to October, 1923. The Chicago Mill & Lumber Company had the right to claim the logs as soon as same were placed on the bank of the river at the place specified. The price to be paid for the logs thus delivered was $16 per thousand feet. Westover Place, on which Westover Landing above mentioned is situated, consisted of about 4,500 acres in the whole plantation, divided into several different small plantations included in this foreclosure. Westover Landing was the landing for all the plantations comprising Westover Place.

The undisputed testimony by those living on the plantations comprising Westover Place was to the effect that timber was cut from Westover Place for R. L. Cobb in the year 1923 between the river and the levee, and that this timber was delivered on the river bank near Westover Landing. They began cutting the timber as soon as the water went down, and continued until the fall. Timber was cut on the places constituting Westover Place on the land side of the levee, or what is known as the "inside of the levee," and the timber thus cut was hauled to Helena.

The undisputed testimony showed that the Howe-Neely Lumber Company purchased timber from R. L. Cobb during the years 1922 and 1923 amounting to $2,209.47.

Without setting out the testimony in detail, we are convinced that the undisputed testimony shows that the timber purchased by both lumber companies from R. L.

Cobb was timber cut by him from the Westover Place. The testimony shows that the proceeds from the sale of the timber by Cobb were used in the farming operations of the place and in making some minor improvements, such as covering some of the houses. The price paid for the timber by the purchasers included the cutting and the hauling—everything that went into the cost of the timber and the cutting and delivering of the same. Mr. and Mrs. R. L. Cobb, at the time of the foreclosure, owed the appellant the sum of $118,000. The land was sold under foreclosure and purchased by the plaintiff for $10,000, and the undisputed testimony is that the foreclosure was subject to a prior mortgage in favor of the Deming Investment Company for $110,000. There is testimony in the record tending to prove that the Westover Place, after the removal of the timber, was worth from $160,000 to $175,000. One witness, A. C. Cobb, son of R. L. Cobb, testified that, in his opinion, the Westover Place was worth $275,000.

Another witness, Gerald Fitzgerald, who was familiar with the land, having purchased the same in 1917, gave it as his opinion that the value of the place was from $160,000 to $175,000. No one had made enough on the place to pay the debt due thereon, the cost of farming the same, and the taxes. The most valuable portion of the plantation was in timber. He had tried to help Cobb sell the place, and never could get an offer that would pay the first mortgage and the plaintiff's mortgage. One hundred and sixty-five thousand dollars was due on the place prior to the last loan made by the Deming Investment Company. The plaintiff had no knowledge of the cutting of the timber.

F. P. Fitzgerald, husband of the plaintiff, testified that Cobb offered to turn the place back by giving a quitclaim deed, but he would never agree to it when he found out about the timber having been removed from the place. Cobb was going to give it up, either by quitclaim deed or by foreclosure, and, when witness was discussing with Cobb concerning taking the place back for his wife by

quitclaim deed from Cobb, Cobb said he had only cut what went on the place for repairs, and witness did not dream that more timber had been removed.

Mrs. Fitzgerald testified that she had no information that Cobb was cutting the timber, and never surrendered her right therein to any one.

There is no testimony in the record tending to prove that the appellees had any actual notice that the timber purchased by them from Cobb was timber on which the appellant had a mortgage, nor is there any testimony to the effect that they had any knowledge that Cobb was selling them the timber without the permission of the appellant. The deed of trust or mortgage of Cobb and wife to the plaintiff was duly recorded before the timber was sold.

The above are substantially the facts upon which the trial court entered a general finding in favor of the appellees and a decree dismissing appellant's complaint against them for want of equity, from which decree is this appeal.

1. The first question to be determined is whether or not R. L. Cobb cut the timber in controversy from land upon which the appellant at the time held a mortgage, and, if so, whether, in cutting such timber, he was a trespasser. The decided preponderance of the evidence—indeed, practically the undisputed evidence—proves that the timber in controversy was cut from the Westover Plantation, upon which the appellant at the time held the second mortgage. Likewise the undisputed testimony shows that the proceeds were used by R. L. Cobb in farming operations and in doing some minor improvements on the land, such as covering several houses and the like. In this State the legal title passes by the mortgagor to the mortgagee, subject to be defeated by the performance of the conditions of the mortgage. *Damenhauer* v. *Dawson*, 65 Ark. 126, 132, 46 S. W. 131, 44 L. R. A. 193, and cases there cited. Therefore the mortgagor, Cobb, would have no right to cut, remove, and sell the timber and use the proceeds of such sale in his farming operations.

The affirmative testimony in the record is that the appellant did not consent to the act of Cobb in cutting and removing the timber in controversy, and there is no proof of circumstances to justify the trial court in concluding that the appellant had given her consent to the removal and sale of the timber. The doctrine in cases like this is well stated in *Searle* v. *Sawyer,* 127 Mass. 491, 494, 34 Am. Rep. 425, as follows:

"If a farmer mortgages the whole or a part of his farm, with a clause permitting him to retain possession, * * * it is within the contemplation of the parties that he is entitled to take the annual crops and wood for fuel, and we do not think that the implied license is necessarily limited to the annual crops, but that it extends to any acts of carrying on the farm which are usual and proper in the course of good husbandry."

It could hardly be said that the usual course of good husbandry justified Cobb in removing the timber from the freehold for purposes indicated in this case, and it cannot be reasonably presumed that the appellant gave her consent to such conduct of Cobb. We conclude therefore that the acts of Cobb were wrong in cutting, removing, and selling the timber for the purposes shown, and such acts constituted him a trespasser.

2. The next question is, was R. L. Cobb a willful trespasser? He must be held to have known that he had no right to cut the timber, except such as was necessary in good husbandry, such as for fuel, for making and repairing fences, and the like, but certainly not for the purpose of paying his expenses of general farming operations, such as the expense incident to the planting, cultivation and harvesting of his crops. Cobb was overwhelmed with debt; he was not able to make financial arrangements to conduct his farming operations, not even to pay his taxes, amounting to about $700. When negotiations were pending looking to the surrender of possession of the plantation by Cobb, he was asked if he had cut any of the timber, and replied, "No, you know I wouldn't do that—only for plantation purposes—for buildings—only what went on the place for repairs."

A. C. Cobb himself, in his testimony, said that nothing was said about his father paying for the timber; that it was not discussed at all. He further stated that the Fitzgeralds knew "that the money my father had got out of the timber had been spent back into the crop." He says: "We discussed what the money was used for." Now, it occurs to us that, under these circumstances, the removal and sale of the timber by Cobb, without having first obtained the consent of appellant, constituted Cobb a willful trespasser. In other words, it must be held that his acts in removing and selling the timber were not in good faith. See *Foreman* v. *Holloway & Son*, 122 Ark. 341, 183 S. W. 763.

3. Such being the case, the next question is, what was the measure of appellant's damages as against the appellees? While appellees had no actual notice that Cobb was a willful trespasser in cutting and removing the timber, they had constructive notice of the mortgage, and therefore must be held to have known that the timber did not belong to Cobb. Therefore, in purchasing and paying Cobb for the timber, instead of the appellant, they placed themselves precisely in Cobb's shoes as to liability for actual damages in conversion of the timber. This court, in *Central Coal & Coke Co.* v. *John Henry Shoe Co.*, 69 Ark. 302, 63 S. W. 49, passing upon a similar question in an opinion voiced by Mr. Justice RIDDICK, said:

"The question here for decision is whether the defendant, who purchased the ties from the trespassers, and then converted them to its own use, is entitled to any reduction in the damages on account of the increase in value caused by the work and labor of the willful trespassers. We must answer this question in the negative. The timber belonged to the plaintiffs. The title to it was not changed by the trespass, or the conversion to crossties. It still belonged, in its improved shape, to the plaintiffs. Had Less & Watkins, who knowingly and wrongfully put labor upon these ties, been sued, they, as before stated, would have been entitled to an allowance or reduction of damages on account of the labor expended or value

added to the timber, and could convey no such right to the coal and coke company. Admit that the company was an innocent purchaser, still it purchased property belonging to plaintiffs from those having no right to sell, it converted this property to its own use, and plaintiffs were, by this conversion, damaged to the extent of the value of the property at the time of the conversion. The company, it will be noticed, did not perform any work and labor on these ties, nor add any value to them. Under these circumstances we think the circuit judge correctly ruled that the measure of damages was the value of the ties at the time and place they were converted by the defendant company, with interest at six per cent. from date of conversion." Citing cases. See also, in addition to the authorities from other jurisdictions there cited, *Hudson* v. *Burton,* 158 Ark. 619, 250 S. W. 898, and other Arkansas cases there cited on page 622 (250 S. W. 899).

Of course the rule would have been different if Cobb had been merely a technical trespasser, innocent of any bad faith or intentional wrongdoing. See *Randleman* v. *Taylor,* 94 Ark. 511-513, 127 S. W. 723, 140 Am. St. Rep. 141, and cases there cited. *Foreman* v. *Holloway & Son, supra; Baker-Mathis Lbr. Co.* v. *Bank of Lepanto,* 170 Ark. 1146, 282 S. W. 995.

4. Counsel for the appellees contend that the conversion of the timber did not impair the security of the appellant. This contention cannot be sustained, for the reason that the undisputed testimony shows that 1,063,120 feet of logs were sold to the appellee, Chicago Mill & Lumber Company, for the sum of $16,661.72, and logs of the value of $2,209.41 were sold by Cobb to the Howe-Neely Lumber Company. Thus Cobb removed timber from the freehold upon which the appellant had a mortgage, which timber in its converted form was of the aggregate value of $18,871.19. While A. C. Cobb testified that it cost $9,991.13 to remove the trees, that still leaves a margin of nearly $9,000 that the timber was worth to the freehold while standing. The removal of the timber therefore lessened the value of the mortgaged

property and appellant's security at least to that extent. While A. C. Cobb testified that, in his opinion, the value of the land was $275,000, a decided preponderance of the evidence shows that he was mistaken in this conclusion. The debt to appellant for which the property was sold at foreclosure amounted to $118,606.54; the property was directed to be sold subject to the rights of the Deming Investment Company; the Deming Investment Company's mortgage, principal and interest, amounted to more than $110,000. The property was sold under foreclosure order of the court at public sale to the highest bidder, and the highest and best bid at the sale was the sum of $10,000, which was the bid of appellant. To have obtained an unincumbered title, appellant would have had to pay the debt to the Deming Investment Company. She had the right to pay that debt and to obtain all the security unimpaired that the investment company had under its mortgage. Whatever lessened the security of the first mortgage, necessarily lessened the security of the appellant. The property, under the law, did not belong to Cobb until the mortgage debts thereon were paid. It belonged to the mortgagee. Primarily the Deming Investment Company had the right to the security, but, if it did not elect to avail itself thereof, then the appellant had the right, in the protection of its security, to hold the appellees liable for the value of the property which, by their purchase, they had enabled Cobb to convert to his own use, to the detriment of the appellant.

5. It is urged by the appellees that the appellant was estopped from claiming the value of the timber from appellees because she knew that it was being removed by Cobb, and made no complaint for a period of almost a year. While the testimony of A. C. Cobb and R. E. Scott, the overseer on the plantation, shows that logs were stacked on the river bank on the Westover Place during the year 1923, and that Gerald Fitzgerald was over the plantation several times while the timber was banked there, yet the appellant herself testified that she had no information or knowledge that Cobb was cutting

the timber on these places. Scott, the overseer, testified that he never saw the appellant on the place. F. P. Fitzgerald testifies that he had absolutely no knowledge of the cutting of the timber until after Cobb had surrendered possession thereof to appellant's agent, Marley. Gerald Fitzgerald testified that he had no knowledge of the cutting of timber during the time same was being cut from December, 1922, until October, 1923. Therefore we conclude that the preponderance of the evidence shows that the appellant was not barred by laches or estopped in any way by her conduct from making a claim for the value of the timber in controversy.

6. While the undisputed testimony of A. C. Cobb was to the effect that the proceeds from the sale of the timber were used in farming operations and making minor improvements, such as covering houses and the like, he does not testify what amount was used in the way of the purchase of necessary fuel or in making the necessary repairs. In short, he does not testify what amount, if any, was used in the course of good husbandry. Cobb commingled the entire proceeds paid him by the appellees for the timber. The burden was upon the appellees to prove what amount, if any, was expended on the plantation in conformity with good husbandry. A. C. Cobb was a witness for the appellees, and they were given an opportunity to develop the facts along this line, and presumably did not do so because they could not.

After a careful consideration of the entire record, our conclusion therefore is that the court erred in dismissing the appellant's complaint against the appellees for want of equity. The trial court, instead, should have entered a decree in favor of the appellant against the appellee, Chicago Mill & Lumber Company, in the sum of $16,661.72, and against the appellee, Howe-Neely Lumber Company, in the sum of $2,209.47, with interest at the rate of six per cent. per annum from date of conversion. The decree is therefore reversed, and the cause is remanded with directions to enter a decree in favor of the appellant against the appellee, Chicago Mill & Lumber

Company, in the sum of $16,661.72, and against the appellee, Howe-Neely Lumber Company, in the sum of $2,209.47, with interest at the rate of six per cent. per annum from the date of conversion.

MEHAFFY, J., dissenting on measure of damages.