ARKANSAS POWER & LIGHT COMPANY *v.* DECKER.

Opinion delivered May 20, 1929.

*Robinson, House & Moses,* for appellant.

*Albert W. Jernigan* and *H. B. Means,* for appellee.

MEHAFFY, J. The appellee filed her complaint in the Hot Spring Circuit Court, and the cause was afterwards transferred to chancery court by consent. She alleged that she was the owner of all sand and gravel situated and being on the following described land, in

the State of Arkansas, and the county of Hot Spring: The south half of the southwest quarter of section 30, township 3 south, range 17 west; the northeast quarter of section 36, township 3 south, range 18 west. That the Arkansas Power & Light Company is engaged in the operation of an electric power plant for the production and distribution of electricity for sale, and is doing business in Hot Spring County, Arkansas. That the appellant constructed and built a large power dam across the Ouachita River at Cove Creek, in Hot Spring County, Arkansas, and in the construction of said dam it used 300,000 yards of gravel and sand from appellee's land. That, after the construction of said dam, the Arkansas Light & Power Company was reorganized, and the Arkansas Power & Light Company took over its assets and became liable for its liabilities, and that it is now doing business under the name of Arkansas Power & Light Company.

It is alleged that the appellants fraudulently entered into collusion to deprive plaintiff of the value of the gravel and sand removed from her lands and used in the construction of the dam, and without authority of law, and without the knowledge of appellee, took from her premises 300,000 yards of gravel and sand which was of the market value of ten cents per cubic yard, being of the aggregate value of $30,000. Appellee alleges that she was not apprised that the defendants had taken her gravel and sand, and had no information about it until some time in 1927.

The defendants filed answer, denying the material allegations in plaintiff's complaint, and stated that Walter S. Kirkham, under whom appellee claimed, had secured a deed from York by false and fraudulent representations, without paying any consideration; that York never delivered his deed to Kirkham, but that Kirkham fraudulently got possession of it and had it recorded. It is further stated that John H. York and those claiming title through him have had actual possession of said property since 1913.

Appellee filed an amendment to her complaint, alleging that the Arkansas Power & Light Company was a willful and wanton trespasser, and she was entitled to recover the market value of the gravel and sand after it was washed and screened, which was $1.25 per cubic yard.

The decree recites, among other things, that judgment was taken by default, and the cause submitted on the complaint of the plaintiff, the answer of the defendants, the summons, and the evidence adduced by plaintiff, together with the exhibits thereto and documents therein contained, together with the correspondence relative to the submission of this cause. And the court finds that this day is the date regularly set for the trial of this cause, and that the defendant has been duly served with summons on the 15th day of December, 1927, being more than 20 days before the first day of the present term of this court, and that it has failed to defend herein. The court then finds in favor of the plaintiff in the sum of $27,500.

Thereafter the appellant filed a motion asking that the judgment entered against it be vacated and set aside, and that it be permitted to file its depositions and offer proof in defense of the action, and with this motion filed the affidavit of Mr. W. H. Holmes, attorney for appellant, to the effect that he had had a telephone conversation with Mr. H. B. Means, attorney for the plaintiff, and that he understood the case would not be tried that day. The court heard this motion, which it overruled, and granted the defendant an appeal to the Supreme Court.

Mrs. L. M. Decker testified, in substance, that she was the owner of the sand and gravel on the south half of the southwest quarter of section 30, township 3 south, range 17 west, for which she paid $1,000 to Walter S. Kirkham. She had never seen Mr. York nor the property, and she learned in the fall of 1927 that the Arkansas Power & Light Company had removed the sand and gravel. She testified that she met Kirkham some time

in 1913 and also in 1914, but that his whereabouts for the past 14 years have been unknown to her. She knew nothing about Kirkham paying Mr. York $1,000 or having given him a note. In 1913 her home was in Ripley, Tennessee, but since 1914 she has been living in Corpus Christi. She never had any other business transactions with Kirkham. She and her mother visited in Hot Springs in 1913, at the time she purchased the property.

John Inglis, a witness for plaintiff, testified, in substance, that he and W. F. McKnight were both employed by the Caddo River Power & Irrigation Company in June, 1922. That this company was operated in conjunction with the Arkansas Light & Power Company. He was present on June 9, 1922, when W. F. McKnight took an option deed from York on certain lands. York advised McKnight that he had given Kirkman an option to the sand and gravel, and explained the transaction to McKnight, but witness did not pay any attention. The gravel used by the Arkansas Light & Power Company was taken from the land of John H. York, Sr., which was the southwest quarter of the northeast quarter of section 36, and the land of John H. York, Jr., which was the northwest quarter of the northeast quarter of section 36. Witness was in York's when Kirkham got his option renewed.

J. H. York testified for the plaintiff that he was formerly the owner of the northeast quarter of section 36, and that he had given McKnight an option, and later gave the Arkansas Light & Power Company a warranty deed. He told McKnight that he had sold the gravel pit to Kirkham, but that Kirkham had not paid him. Part of the gravel used in the construction of the Remmel Dam was taken from the southwest quarter of the northeast quarter of section 36 and part was taken from the northwest quarter of the northeast quarter of section 36.

E. H. Barker, a witness for plaintiff, testified, in substance, that he was employed by the construction company which built Remmel Dam; that his checks were

from the Arkansas Power & Light Company. He was foreman of the gang which removed the gravel. There was a trolley line running from the gravel bar to the washer at the dam, and a drag line dug the gravel out of the pit and dumped it into the hopper. It was carried from the hopper to the dam on a trolley line consisting of 24 buckets, running on a continuous chain. Each of the buckets had a capacity of one-half yard. The buckets would make a complete revolution in thirty minutes. They worked ten hours a day and a great deal of overtime at nights. Most of the gravel came from old man York's land, and was used in the construction of Remmel Dam. They worked seven days a week, in all kinds of weather, and the machine was run on an average of ten hours a day for eighteen months. Witness did not keep any record or make any reports of his work. There were from seven to twenty men working under him. Witness thought that from 50,000 to 60,000 yards of gravel and sand went into the dam. It might have been more or less. He did not keep any record, and never heard any one state the number of cubic yards of concrete in Remmel Dam.

Sam Bittles testified for the plaintiff that he was engaged in the concrete construction business; and resided in North Little Rock. The market value of gravel is 80 cents per ton, and the market value of sand is 60 cents per ton. This would amount to about one dollar per cubic yard for gravel and 75 cents for sand. Witness' prices on local sand and gravel are based on the prices at Benton, Arkansas. The price of sand and gravel was higher in 1924 than now. Witness has given the retail prices on sand and gravel. The values depend largely upon the use intended. The value of a deposit of gravel is determined by what it can be used for. It costs from 20 cents to $1 per yard to remove sand and gravel from the pit. The location and the expense necessary to transport it to the place where it is used and the quantity available largely determine the price it brings.

S. H. Leiper testified that he was State Highway Inspector, and lived at Malvern, Arkansas. He sold the Arkansas Light & Power Company the site for Remmel Dam, and is acquainted with the lands along the Ouachita River. The gravel used for constructing the dam was taken from the southwest quarter of the northeast quarter and the northwest quarter of the northeast quarter of section 36, township 3 south, range 18 west. Witness was present a number of times when gravel was being taken off the bar and used in the dam. It was suitable for construction purposes, and stood the test of the Van Trump Testing Laboratory in Little Rock. It is about seven-eighths of a mile from this land to Cove Creek, a shipping station on the main line of the Rock Island Railroad.

This was all the testimony introduced by the plaintiff; and, as the decree recites, the case was decided on the evidence introduced by the plaintiff, and the evidence taken by defendants was not considered—in fact, had not been filed when the decree was rendered.

The only evidence tending to show the amount of sand and gravel taken was the testimony of E. H. Barker, who testified that he did not keep any record or make any reports, but that he believed there was from 50,000 to 60,000 yards of sand and gravel in the dam. He said, however, it might have been more or less. And the only evidence as to the value of the sand and gravel was the evidence of Sam Bittles, who lived in North Little Rock, and testified as to the market value. He said the market value of gravel is 80 cents per ton and of sand is 60 cents per ton; that this would amount to about one dollar per cubic yard for gravel and 75 cents for sand; that his prices on local sand and gravel are based on those at Benton, Arkansas, and that the prices he had given were the retail prices of sand and gravel. It appears therefore that there was no evidence from which the court could have found the market value of the sand and gravel except the evidence of Bittles, who testified about the

retail price. Of course this would be no evidence of the market value at the time and place it was taken.

"The measure of damages recoverable in trespass for the wrongful working of a mine is affected largely by the circumstances of each case, and depends upon whether the wrongful act was done willfully and with the knowledge of the violation of another's rights, or innocently and through the wrongdoer's mistaken belief as to his rights. It is the prevailing rule that, in an action of unlawfully working a mine and extracting coal or ore therefrom, if the taking was not a willful trespass, but the result of an honest mistake as to the rights of the wrongdoer, the measure of damages is the value of the coal or ore as it was in the mine before it was disturbed. The recovery in such case is limited, first, by the value of what is taken, and second, by the cost of mining, extraction and hauling to the surface. To this is sometimes added the cost of milling, while under other authorities nothing additional is allowed for separating or other acts necessary to render it marketable. Another rule is that, where the trespass is unintentional, the measure of the damages is the value of the mineral in the bed, with the incidental injury to the land. When the wrongdoer commits the trespass willfully and with the knowledge that he is invading the rights of another, or under such circumstances as to charge him with knowledge of the character of his act, a different rule obtains. In such case the measure of damages is the value of the thing mined at the time of severance, without making deduction for the cost of labor and other expenses incurred in committing the wrongful act; and at times exemplary damages may be allowed in addition to compensatory damages." 18 R. C. L. 1256.

The rule, however, is well settled by the decisions of this court. This court has followed the rule above announced, with reference to the measure of damages. If the trespasser was innocent, believing he had a right to take the ore, the measure of damages would be the

value of the sand and gravel taken in the ground. If, however, the trespass was willful, the other rule applies.

This court said: "Under these circumstances it is clear that, being willful trespassers, they were liable to the plaintiffs for the full value of the ties at the time of the sale and conversion, and, had they been sued, would have been entitled to no reduction on account of labor and expense. The rule would have been different had they been innocent of intentional wrong, the reasons for which are fully explained in the opinion in a recent case decided by this court." *Central Coal & Coke Co.* v. *John Henry Shoe Co.,* 69 Ark. 302, 63 S. W. 49; *Eaton* v. *Langley,* 65 Ark. 448, 47 S. W. 123, 42 L. R. A. 474; *Fitzgerald* v. *Chicago Mill & Lbr. Co.,* 176 Ark. 64, 3 S. W. (2d) 30, 57 A. L. R. 444.

Since there is no sufficient proof of the amount of sand and gravel taken and no sufficient proof as to its market value, the case will have to be reversed. It is argued by appellee that the decree is sustained by the law and the evidence, and appellee quotes from and argues the testimony of R. C. Lynch, appellant's engineer. But this evidence was not considered by the court. In fact, the depositions had not been filed at the time the decree was rendered, and we have only considered the evidence here that was considered by the court below. It will therefore be necessary for the appellee to take further testimony as to the amount of sand and gravel taken and the market value of the same, and, if the testimony taken by the appellant is considered, together with any other testimony that it may wish to take, the court can then determine whether the trespass was willful, and can determine which rule of damages is applicable.

Since we have reached the conclusion that the case must be reversed and more evidence taken, it is unnecessary to discuss or decide the question as to the misunderstanding of the attorneys. This will probably not occur again.

The decree of the chancellor is reversed, and the cause remanded, with directions to permit the parties to fully develop the case, and for further proceedings not inconsistent with this opinion.