**HARROD CONCRETE AND STONE CO., Appellant**

v.

**B. Todd CRUTCHER, etc., et al, Appellees**

**2013–SC–000549–DG**

Supreme Court of Kentucky.

RENDERED: APRIL 2, 2015

COUNSEL FOR APPELLANT: Robert W. Kellerman, Sarah Jackson Bishop

COUNSEL FOR APPELLEES: J. Robert Lyons, Jr.

## OPINION OF THE COURT BY JUSTICE CUNNINGHAM

B. Todd Crutcher, individually, and as trustee of the B. Todd Crutcher Living Trust, and his brother, James Donald Crutcher (collectively "the Crutchers"), own and possess 36 acres of unimproved land in Franklin County. The Crutchers' property borders a 500–acre tract of land owned by Harrod Concrete and Stone Co. ("Harrod"), which Harrod operates as an underground limestone quarry. In 2002, while mining its own property, Harrod trespassed and removed approximately 164,000 tons of limestone from 300 feet below the surface of the Crutchers' land. In 2010, after many years of litigation, a Franklin Circuit Court jury unanimously awarded the Crutchers $36,000 in compensatory damages and $902,000 in punitive damages.

The trial court sustained the compensatory award but reduced the punitive damages to $144,000. A unanimous Court of Appeals panel partially reversed and vacated the circuit court's decision, and remanded the case for further proceedings. We granted discretionary review. After reviewing the record and the law, we reverse the decision of the Court of Appeals.

### *Tendered Jury Instructions*

The jury received separate instructions for compensatory and punitive damages. Upon finding a trespass, Instruction No. 3 required the jury to "determine the reduction in the fair market value of the Plaintiffs' property caused by the trespass of the Defendant." That instruction permitted the jurors to consider "the reduction in mineable limestone by applying a royalty value per ton of stone taken by the Defendant. . . ." In *addition* to the compensatory damages authorized under Instruction No. 3, Instruction No. 4 authorized the jury to award punitive damages based on clear and convincing evidence that "the Defendant acted in reckless disregard for the property of others, including Plaintiffs. . . ."

We agree with the Court of Appeals that an instruction authorizing a determination of recklessness was appropriate. However, the tendered instructions contained errors of sequence and substance that irreparably tainted the jury's actual finding of recklessness and, most importantly, the amount of damages awarded as a result. Accordingly, we cannot salvage the jury's determination in whole or part and must remand for a new trial implementing jury instructions that comport with the following analysis.

### Mineral Trespass Actions

We begin by noting that this is not a pure trespass case; rather, it is a trespass/conversion hybrid that is analogous to cases involving the unauthorized removal of minerals. Our jurisprudence frames these types of controversies as trespass actions because the gravamen involves subsurface resources that were once in place. Unlike typical trespass cases, however, the damage sustained to the surface may be negligible or non-existent compared to the damage resulting from removal of the natural resources that lay beneath. Once the resources are removed from their native state, they become personal property and are sold at market by the trespasser.

While the trespass triggers the injury to the landowner, it is the conversion that creates the actual or enhanced value of the extracted resources. Therefore, our precedent seeks to strike a balance between the conversion and trespass measures of damages while incorporating one critical factor—the willfulness of the conduct. The following cases demonstrate the evolution of this unique component of tort law and instruct our decision in the present case.

### Historical Background and Current Kentucky Rule

■ Early English and American cases involving the unauthorized removal of minerals applied the conversion standard of damages, thus allowing the injured landowner to recover the market value of the minerals converted without deduction for extraction expenses. *E.g., Martin v. Porter*, 151 Eng. Rep. 149 (1839); *U.S. Blaen Avon Coal Co. v. McCullah*, 59 Md. 403 (1883). By the early Twentieth Century, however, our predecessor Court had rejected the automatic application of this so called "penal rule." In *Sandy River Cannel Coal Co. v. White House Cannel Coal Co.*, the Court first articulated a more tempered approach that endures today. 72 S.W. 298 (Ky.1903). This newly established paradigm was summarized in *North Jellico Coal Co. v. Helton*:

we deem it proper to say that the measure of damages for coal taken from another's land through an honest mistake is the value of the coal taken as it lay in the mine, or the usual, reasonable royalty paid for the right of mining. On the other hand, where the trespass is willful, and not the result of an honest mistake, the measure of damages is the value of the coal mined at the time and place of its severance, without deducting the expense of severing it.

187 Ky. 394, 219 S.W. 185, 186 (1920) (citations omitted).

This approach is now well-established. Thus, the amount of damages to which an injured property owner is entitled is dependent upon whether the trespass was innocent or willful. Damages provided under the latter category reflect the punitive conversion measure once embraced in all cases without exception. In contrast, damages resulting from an innocent trespass attempt to make the injured party whole without unjustly penalizing good-faith trespassers.

Accordingly, innocent trespass damages have been determined as the value of the minerals before they were extracted. In Kentucky, this is valued at the usual, reasonable royalty paid for the right of mining—that which is normally negotiated between the landowner and lessee/producer at the time of mining. *E.g., North East Coal Co. v. Blevins*, 277 S.W.2d 45 (Ky. 1955). This royalty value of damages only applies to injured parties not in a position to mine the resources on their own. However, if the injured party was in a position to mine the converted resources itself, courts assess the value of the minerals

before they were extracted at the market value of the minerals less the reasonable expenses incurred in mining. *Hughett v. Caldwell County*, 313 Ky. 85, 230 S.W.2d 92, 96 (1950). This modified royalty approach applies equally to trespass cases involving hard minerals such as coal, and fugacious minerals such as oil and gas. *Swiss Oil Corp. v. Hupp*, 253 Ky. 552, 69 S.W.2d 1037, 1039 (1934) (awarding the net fair market value of oil in a suit between two lessees). To summarize, if the aggrieved party was in the position to mine, then that party is compensated for the entire profit. If not, the aggrieved party is awarded a mere royalty payment.

Our case law has not provided us with much guidance on the meaning of "ability to mine." *Blevins*, 277 S.W.2d at 49. We can only assume that it means individuals or entities already engaged in the mining business, or readily capable of extracting the minerals themselves. As subsequently explained, we eliminate this consideration from our jurisdiction.

In contrast to the current Kentucky rule, the majority of mineral producing jurisdictions do not consider the injured party's ability to mine for purposes of determining damages. In these jurisdictions, the proper measure of damages in innocent trespass cases is the value of the minerals after extraction, less the reasonable costs incurred by the trespasser in producing the minerals. *See* 21 A.L.R.2d 380, § 3(c) (2015); 58 C.J.S. *Mines and Minerals* § 179 (2015).[1] Therefore, Ken-

tucky's modified royalty rule represents a minority approach.

Although this modified approach has been consistently applied in the Commonwealth, it is not without exception. *See Rudy v. Ellis*, 314 Ky. 524, 236 S.W.2d 466 (1951); *Delta Drilling Co. v. Arnett*, 186 F.2d 481 (6th Cir.1950); *see also* 21 A.L.R.2d 380, § 3(e) (2015) (noting that *Rudy* and *Delta Drilling* deviated from *Swiss Oil Corp.*). Citing *Rudy*, several recent oil and gas commentators have concluded that Kentucky follows the net value method for calculating damages in innocent trespass cases.[2] Considering the collective discourse, we take this opportunity to re-examine the application and purpose of the modified royalty approach in order to bring harmony to our own discordant and dated decisions.

### Re-examining the Kentucky Rule

In his primer on this issue, Kentucky Circuit Court Judge Kelly M. Easton notes the history and criticism of the Kentucky rule. *The Measure of Damages for Mineral Trespass—A Kentucky Perspective*, 4 J. Min. L. & Pol'y 137 (1988–1989) (Easton). He writes that the deplorable state of title in mineral producing regions and the immense societal value derived from mining may have guided early Kentucky decisions. *Id.* at 154. However, even some early Kentucky cases cast doubt on the propriety of the royalty approach.

For example, *Hughett* involved an innocent trespass where the Court awarded the net fair market value of the converted material to an injured landowner who was

---

1. *See also* Jeff A. Woods & Helena R. Smith, *What Kinds of Punitive Damages May Be Awarded for Willful Trespass to Minerals?*, 29 E. MIN. L. FOUND. § 4.02 (2008) (Woods & Smith) (providing a state-by-state analysis of mineral trespass law).

2. Owen L. Anderson, *Lord Coke, The Restatement, and Modern Subsurface Trespass Law*, 6 Tex. J. Oil Gas & Energy L. 203 (2010–2011); Brian J. Pulito, Nathaniel I. Holland, & Jon Beckman, *A State of Mind: Determining Bad Faith in Trespasses to Oil and Gas* [ ], 2 Tex. A & M L.Rev. 53 (2014); Owen L. Anderson, *Subsurface "Trespass": A Man's Subsurface is Not His Castle*, 49 Washburn L.J. 247 (2010).

actively engaged in mining. In so holding, the Court refuted the royalty approach by reasoning that "[r]oyalty is a matter of contract—not of damages for a tort." 230 S.W.2d at 96. "Why should not the innocent trespasser also pay the owner in full for his loss. . . ." *Id.* at 97. Therefore, while limiting its holding to injured property owners in a position to mine, *Hughett* nevertheless challenges the general efficacy of the royalty approach. *See also Swiss· Oil Corp.,* 69 S.W.2d at 1046 ("In a court of conscience, the one party is not chargeable with more and the other is not entitled to less.").

These sentiments are echoed in additional academic literature on the topic. *Hughett v. Caldwell County—Measure of Damages for Innocent Conversion of Minerals,* 39 Ky. L.J. 236, 238 (1950–51) (arguing for the application of *Hughett* to all innocent trespass cases, "regardless of whether or not the owner is in a position to mine the minerals himself."). One early critic of the royalty approach similarly opined:

> Where recovery is limited to the reasonable royalty value of the property converted, the wrong-doer, though innocent, is actually profiting by his wrong in that he not only deducts the expenses of production but has sufficient allowances remaining to realize a profit therefrom. This is a violation of all established legal principles and the arguments of the courts in sustaining such a legal monstrosity seem founded on reasons of expediency rather than principles of justice.

Easton, 4 J. Min. L. & Pol'y at 152 (quoting *Damages for the Conversion of Minerals,* 21 Notre Dame L.Rev. 201 (1945–46)).

Under the royalty rule, a trespasser retains the lion's share of his ill-gotten profits by essentially forcing the injured property owner to engage in a post facto lease.

Thus, the property owner has lost the freedom to contract as he chooses and must forego his ability to bargain for a better royalty in the future. Under the majority, net value approach, however, the trespasser is credited for his costs while the landowner receives the profit. As such, neither party is unjustly enriched nor subjected to undue disgorgement.

### Adopting the Net Value Rule

 Considering the evolution of our precedent and having no good cause to sustain the royalty rule or any modification thereof, we now join the majority of mineral producing jurisdictions. Whether the injured party is in a position to extract the resources shall no longer dictate damages. Accordingly, the proper measure of damages in all innocent trespass cases is the value of the mineral after extraction, less the reasonable expenses incurred by the trespasser in extracting the mineral. Permissible expenses are those "reasonably calculated to be beneficial and productive" in the mining operation. *Joyce v. Zachary,* 434 S.W.2d 659, 661 (Ky.1968). Whether to allow or disallow specific expenses is a determination for the trial court. *Howard v. Kingmont Oil Co.,* 729 S.W.2d 183, 187 (Ky.App.1987).

 Where the trespass has been determined to be willful, we continue to maintain that the measure of damages is the reasonable market value of the mineral at the mouth of the mine/well, without an allowance of the expense of removal. This approach has been consistently applied in Kentucky and serves as a sufficient financial penalty for the wrongdoing of the trespasser, thus obviating the need for additional punitive damages. It is also the rule embraced by the majority of jurisdictions that have addressed the issue. 21 A.L.R.2d 380, § 5 (2015); Woods & Smith, *What Kinds of Punitive Damages May Be Awarded for Willful Trespass to Miner-*

*als?, supra,* at 104–55. Our holding applies equally to fugacious and non-fugacious minerals.

### Application of Mineral Trespass Cases

■ Much has been argued in this case about the propriety of applying the above referenced mineral cases in the context of limestone—an abundant sediment that fortifies most of Central Kentucky. We acknowledge the authority holding that "limestone is not legally cognizable as a mineral." *Little v. Carter,* 408 S.W.2d 207, 209 (Ky.1966); *see also Elkhorn City Land Co. v. Elkhorn City,* 459 S.W.2d 762, 764 (Ky.1970). However, analogizing those contract determinations to the present tort action is misguided. Geology is not determinative here. *See* KRS 143.020 and KRS143A.020 (taxing the severance or processing of coal and natural resources such as limestone at the same statutory rate without regard for geological distinction).

In short, we see no cognizable legal distinction between the mineral trespass line of cases and the present case. *See Hughett,* 230 S.W.2d at 96 (applying oil and gas trespass cases to unauthorized mining of fluorspar); *Arkansas Power & Light Co. v. Decker,* 179 Ark. 592, 17 S.W.2d 293 (1929) (applying mineral trespass cases to conversion of sand and gravel). Thus, it is unnecessary to craft an arbitrary exception to our mineral trespass paradigm, the proper application of which succeeds in making the injured party whole, while also providing a punitive mechanism for expressing society's disdain for willful conduct.

### Remand and Retrial

Upon remand, if the jury determines that an innocent trespass occurred, it shall award the value of the limestone in place—the reasonable market value of the limestone at the mouth of the mine, less the reasonable costs incurred in mining. This equates to the value of the unprocessed "shot rock," less mining operation expenses that were reasonably calculated to be beneficial and productive in producing the shot rock. In the alternative, if the jury determines that a willful trespass occurred, it shall award the reasonable market value of the shot rock *without* an allowance of the expense of removal.

■ To clarify, the Crutchers may recover damages under either the innocent trespass instruction *or* the willful trespass instruction, but not both. Furthermore, the willful trespass instruction shall not give rise to an instruction for punitive damages. Here, the gross fair market value of the mined material constitutes compensatory damages, albeit of a punitive nature. Due to the unique concerns involved in these types of cases, the fair market value standard awarded for willful trespasses negates an additional or separate recovery for punitive damages. Because we are remanding this case for a new trial, it is also necessary to elaborate on the applicability of a willful trespass jury instruction upon remand.

### Innocent/Willful Dichotomy

■ Conduct that is inadvertent or "the result of an honest mistake" constitutes an innocent trespass. *North Jellico Coal Co.* 219 S.W. at 186. In contrast, willful conduct has been summarized as follows:

> a willful trespasser is one who knowingly and willfully encroaches or enters upon the land of another and takes his mineral without color or claim of right, or one who dishonestly or in bad faith mines minerals of another and converts them to his own use....

*Hughett,* 230 S.W.2d at 94.

Reckless conduct also constitutes a willful trespass. *Sandlin v. Webb*, 240 S.W.2d 69 (Ky.1951); compare *Kycoga Land Co. v. Kentucky River Coal Corp.*, 110 F.2d 894 (6th Cir.1940) (equating "mere negligence" with innocent trespass). For a thorough analysis of the distinctions between innocent and willful trespasses, see Easton, 4 J. Min. L. Policy at 146–54. *See also* 19 Am.Jur. Proof of Facts 2d 529 (2015). According to the proof developed at trial, we believe that the jury was properly instructed on a willful trespass theory.

■■■■ Commercial organizations operating in either surface or subsurface environments must engage in diligent efforts to determine their boundary lines in order to ensure that the property to which they claim a right is, indeed, the correct property. Evidence demonstrating that a trespasser continued or perpetuated its encroachment despite cautionary indicators that property may have been misidentified is certainly relevant to the jury's determination. This may be based, in part, upon the property itself or "evidence regarding the policies and procedures of the company." *See MV Transportation, Inc., v. Allgeier*, 433 S.W.3d 324, 338 (Ky.2014) (citing *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 388 (Ky.1985)).

### Evidence of Willfulness

■■■ The record in the present case demonstrates that Harrod failed to have a boundary survey performed between 1996 and 2002, even though Harrod's President, David Harrod, testified that he knew that the mining activity was nearing the Crutchers' property. Although underground maps called "plan sheets" were prepared annually for Harrod by engineers, they only depicted approximate and uncertified boundary lines. Nevertheless, even the plan sheets demonstrated a constant progression towards the Crutchers'

property. Although Harrod was aware of this progression, it did not secure a certified boundary survey until 2003; a year after the trespass occurred. *See Jim Thompson Coal Co. v. Dentzell*, 216 Ky. 160, 287 S.W. 548 (1926) (finding a willful trespass due to evidence of defendant's failure to properly maintain maps and ascertain accurate boundary lines); *Sandlin*, 240 S.W.2d at 70 (determining that the jury should decide whether defendants knowingly trespassed, where evidence demonstrated that defendants knew that they were "only 200 feet from [plaintiffs'] property and working straight toward it.").

Cecil Banta, Harrod's quarry manager at the time of trial, testified that Harrod had no procedure in place for correlating the subsurface mining activity to the surface boundary lines prior to 2003. In fact, Harrod did not discover the trespass on its own. Harrod first learned of the potential encroachment upon being cited by the Kentucky mining authorities for mining outside the area authorized by its permit. Mr. Banta further testified that when he began his employment at Harrod in 2003, he implemented a grid map system that correlated surface coordinates to the subsurface activity. Banta stated that this type of grid map method had been available since the early 1990s and had been implemented by his previous employer prior to 2003.

Moreover, evidence was introduced that Harrod did not even attempt to apply the property description information included in its own deeds to the plan sheets or other materials in order to ascertain a more accurate subsurface location. Two of Harrod's employees testified that they were completely unaware of their underground location relative to the surface boundaries. Lastly, evidence was presented that around 1991, Harrod had encroached on another property bordering its operations.

Considering the totality of the circumstances, there was certainly a jury question concerning a willful trespass. Such a jury instruction is appropriate upon remand.

### Expert Testimony

 Harrod further contends that the trial court erred by admitting the testimony of Steven Gardner, a licensed mine engineer who testified concerning royalty and market price calculations. . KRE 702 permits opinion testimony of "a witness qualified as an expert by knowledge, skill, experience, training, or education[,]" if that testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue...." *See also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We review a trial court's determination whether a witness is qualified to give expert testimony for an abuse of discretion. *Brown v. Commonwealth,* 416 S.W.3d 302, 309 (Ky.2013).

Gardner testified that he had an extensive history in the mining industry spanning several decades and that he had previously been involved in mine appraisals, valuations, and royalty calculations. Thus, he was sufficiently qualified as an expert of the subject matter about which he was testifying. Furthermore, the methods Gardner employed to gather royalty and market price data were sufficient to provide reliable information that would aid the jury in its determination.

Harrod takes specific issue with Gardner's use of data gathered from a telephone survey of quarries concerning market prices. Harrod contends that the methods employed by Gardner and his staff in gathering and calculating this survey data were unscientific, and that the results were undocumented. Although the survey results may have been otherwise inadmissible, it is proper for experts to rely upon this type of information when forming their opinions. KRE 703(a); *Brown v. Commonwealth,* 934 S.W.2d 242, 247 (Ky.1996).

Gardner also based his calculations in part on other sources of data including information maintained by the Kentucky Transportation Department demonstrating limestone prices around the time the trespass occurred. That data specifically listed Harrod as offering $5.00 per ton for "shot rock" limestone in 2002. Moreover, Gardner testified that the information upon which he relied is of the type reasonably and typically relied upon by experts in his field. Accordingly, the trial court did not abuse its discretion in admitting Gardner's testimony.

### Remaining Issues

Harrod also argues that the trial court erroneously denied its directed verdict motion and disregarded the parties' pre-trial stipulation of damages. In light of the foregoing analysis, these arguments are moot. The parties' arguments concerning the trial court's reduction in the jury's punitive damage award is also moot. To the extent that the Due Process Clause is implicated here, its dictates are satisfied upon issuance of a jury verdict and damages that comport with the foregoing analysis.

### Conclusion

In summary, when measuring damages in mineral trespass cases, we eliminate any distinction between those injured parties with the ability to mine and those who do not have the ability to mine. An innocent trespasser will be responsible for the value of the minerals after extraction, less the mining operation expenses that were reasonably calculated to be beneficial and productive in producing the minerals. In

willful trespass cases, the landowner is entitled to an award equal to the fair market value of the minerals without any allowance for expenses. Thus, punitive damages are not afforded.

For the foregoing reasons, we reverse the Court of Appeals' decision, vacate the jury verdict and damages, and remand this case to the trial court for further proceedings consistent with this opinion.

All sitting. Minton, C.J.; Abramson, Barber, Keller, and Noble, JJ., concur. Venters, J., dissents by separate opinion.

VENTERS, J., DISSENTING:

I respectfully dissent. Notwithstanding the fine research and analysis contained in the majority opinion, I would not abandon the traditional distinction reserved for limestone and other ubiquitous rock underlying vast regions of Kentucky.