## McGraw v. Berry.

## Opinion delivered February 15, 1926.

1. JUDGMENT—FINALITY.—A decree which declared the title to land to be in the plaintiff and that defendants were liable for coal extracted therefrom by them was not final, and, though the decree was affirmed by this court, the extent of liability of the several defendants was open for subsequent determination.

2. CORPORATIONS—TRESPASSES—LIABILITY OF STOCKHOLDERS.—While the stockholders of a coal mining company as such are not liable for trespasses committed by the corporation, yet where they were the active managers of its mining operations, they were joint trespassers with the company in the removal of the coal from another's land.

3. CORPORATIONS—TRESPASSES—LIABILITY OF STOCKHOLDERS.—Where stockholders and active managers of a coal mining company sold their stock and ceased to participate in its management, they ceased to be liable for its subsequent acts in removing coal from another's land.

4. TRESPASS—LIABILITY OF PURCHASER OF COAL WRONGFULLY REMOVED.—A purchaser of coal wrongfully removed from another's land will be liable to the latter for its value.

5. TRESPASS—WRONGFUL REMOVAL OF COAL—LIABILITY OF GUARDIAN.—A guardian of minors who signed a lease to a coal company authorizing the removal of coal from land belonging to a third person and accepted a royalty therefor on behalf of his wards, but took no active part in such wrongful removal of coal, was not personally liable therefor.

6. MINES AND MINERALS—UNLAWFUL CONVERSION OF COAL—DAMAGES.—Where coal is unlawfully extracted from another's premises through honest mistake, the measure of damages is the value of the coal in place in the ground; but where the taking is done wilfully and intentionally, the measure is the value of the ore at the mouth of the mine.

7. MINES AND MINERALS—CONVERSION OF COAL—LIABILITY.—Where there was no evidence that defendants had any knowledge of plaintiff's claim to the land from which defendants removed coal prior to the commencement of the suit herein, and none that they were not acting in good faith in contending that they were rightful owners of the coal and had a right to remove it, they will be held liable only for the value of the coal in place in the ground.

8. MINES AND MINERALS—CONVERSION OF COAL—MEASURE OF DAMAGES.—The fact that defendants had an opening for the removal

of coal from plaintiff's land through an adjoining tract owned by defendants cannot be considered in determining the value of the coal wrongfully removed by them from plaintiff's land.

Appeal from Franklin Chancery Court, Ozark District; *J. V. Bourland,* Chancellor; reversed.

*Warner, Hardin & Warner, Hays, Priddy & Hays, A. A. McDonald,* and *Hamilton Moses,* for appellant.

*Evans & Evans,* for appellee.

McCulloch, C. J. This appeal is a continuation of the case which was formerly here on appeal under the same style as above, and the decree then appealed from was affirmed. 152 Ark. 452. It is an action instituted by appellees against appellants, and certain other defendants who have not appealed, to recover a certain tract of land in Franklin County, and for recovery of rents and profits, and the value of coal removed from the land.

Appellants and the other defendants asserted title under a conveyance from one who was claimed to be the original owner of the land, under mineral leases obtained from the grantees of said asserted owner. The original decree formerly appealed from established the title of appellees as against all of the defendants in the action and ordered reference to a master to hear testimony and ascertain the amount and value of the coal removed by the defendants from the land, and also to ascertain the amount and value of rents and profits arising from the use of the surface of the land for farming purposes, and the value of improvements made by one of the defendants.

After hearing testimony, the master found that there had been removed from the lands coal of the quantity of 100,173 tons (which is undisputed), and that it was of the value of twenty-five cents per ton. The master also apportioned the liability of the defendants, and the court, after overruling exceptions, rendered a decree in accordance with the findings of the master so far as relates to the quantity of coal removed and its value and the proportion of the liability imposed against the respective parties. The court also approved the report of the

master concerning the rents and profits for the use of the surface of the land and the value of the improvements, except in certain particulars which will be mentioned later.

In order to interpret the effect of the original decree so far as relates to the issue presented on the present appeal, the following portions are to be considered:

"The defendants, Denning Coal Company, M. E. Butts, Elvis Butts, Mrs. Lizzie. Pyle, Henry Russell, Truss Rye, guardian for Jay and Annice Rye, minors, and Truss Rye in his own right, are liable to the plaintiff for all coal extracted by said Denning Coal Company from said lands within three years next before the institution of this suit, which was on the 9th day of October, 1919, and up to the time of the rendition of this decree, and for all damages and waste committed on said lands within said time in operating said coal mines or otherwise. * * * The defendant, Arkansas Light & Power Company, is liable to the plaintiff herein for all coal mined from his land, recovered by him in this action, which was done or caused by said Arkansas Light & Power Company or authorized or consented to by it since the 9th day of October, 1916, and said defendants, Henry Russell, Mrs. M. E. Butts, Elvis Butts, Mrs. Lizzie Pyle, Jay Rye, Annice Rye and Truss Rye, are also liable for coal extracted and damage done by said Arkansas Light & Power Company from and to plaintiff's property. The said defendant Dave McGraw is liable to the plaintiff herein for the rents of said land from the 28th day of January, 1919, the date of the death of Allen H. Berry, and is also liable to the plaintiff for timber and posts cut and removed from said lands since the 9th day of October, 1916. * * * The plaintiff is also entitled to recover from the defendants, Dave McGraw, Henry Russell, D. G. Pendergrass, W. J. Pendergrass, Mrs. M. E. Butts, Elvis Butts, Mrs. Lizzie Pyle, Truss Rye, Jay Rye, Annice Rye, Denning Coal Company and Arkansas Light & Power Company, damages for the extraction of coal

and for waste and injury committed on the estate of the said plaintiff in said lands as hereinbefore set forth, since the 9th day of October, 1916. * * * In taking proof and stating said account, the master will charge against each of the defendants all waste, damage, removal of coal and timber committed by the particular defendant, or which he or she aided, abetted, consented to, procured or authorized. The defendants, Dave McGraw, D. G. Pendergrass and W. J. Pendergrass, are liable for coal removed and damage done by the Denning Coal Company which was done with their aid, consent and assistance. The defendants, Mrs. M. E. Butts, Elvis Butts, Mrs. Lizzie Pyle, Truss Rye and Henry Russell, are liable for all coal removed and for damage done under leases from them. * * * In stating the account, the master will find the value of the coal in place at the time of severance and removal from plaintiff's land."

All questions as to the title to the tract of land in controversy (including, of course, the coal embedded therein) were settled by the former decree, which was affirmed here, and we have only to deal now with the question of liability of the respective appellants for the value of the coal removed therefrom.

The controversy as to the title to the land was between appellee on the one part and Henry Russell and the heirs of Dr. Butts on the other part. Russell and Butts purchased the land from Martha J. Roberts, who, according to the original decree, had no title. In December, 1914, Russell and the widow and heirs at law of Butts executed a mineral lease to appellants Dave McGraw, W. J. Pendergrass and Dave Pendergrass and another person, W. D. Logue by name, who is not a party to this action. These parties had previously acquired a lease on an adjoining tract of land from Ada Bourland, and they had also acquired a lease to another adjoining tract from the Western Coal & Mining Company. These parties then formed a corporation, designated as the Denning Coal Company, and assigned the leases to

that corporation. They were the managing officers of the corporation, and conducted the mining operations for the corporation. A mine was opened on the Bourland land, and coal was taken out of that land, and also from the land in controversy, known as the Berry land, and also from the other leased tracts. They began taking coal from the Berry tract on or about October 9, 1916, and up to June 1, 1918, they removed 25,632 tons of coal from the Berry land, when on that date they sold their stock in the corporation and thereafter had no connection with the operation of the mine. The sale of the stock of the Denning Coal Company made by the above named parties was to persons who are not parties to this action, namely, Mullen, McDowell, Couch and McCain, the last two mentioned being connected with appellant Arkansas Light & Power Company, another corporation. There is a contention by the appellee that the Arkansas Light & Power Company was also a purchaser of the stock, and that feature of the case will be mentioned later. The mine was operated by the Denning Coal Company under its new management from the time of the purchase on June 1, 1918, until March 31, 1919, and 28,456 tons of coal were removed from the Berry tract. All of the coal thus mined out of the Berry tract during the period just mentioned was purchased by the Arkansas Light & Power Company from the Denning Coal Company under a contract whereby the Light & Power Company was to purchase all of the coal from the three tracts, namely, the Bourland tract, Western Coal & Mining Company tract, and the Berry tract. On April 1, 1919, the Denning Coal Company sold out its properties, including the leases, to appellant Arkansas Light & Power Company, and the latter operated the mine from then until it was closed down on March 31, 1921, there being removed during that period 46,085 tons. Two of the Butts heirs were infants, and appellant Truss Rye was their legally appointed guardian. These heirs were Rye's children, and they resided in Pope County, where the guardianship was pending.

The mineral lease made by Russell and the Butts heirs to McGraw and his associates was signed by Rye as guardian of his children. The undisputed evidence in the case shows that Rye did nothing in promoting the lease and had nothing to do with it except to sign the contract for his wards after it had been negotiated by Russell and the other heirs who owned the larger interest. Rye received, during the proceedings, about $1,100 in royalties at ten cents per ton, in accordance with the terms of the lease. The court found that Russell and the Butts heirs and Rye personally were liable for the full amount of coal mined out of the tract by all of the parties, and decreed a recovery against them for the full amount, 100,173 tons, at twenty-five cents per ton. The court found that McGraw and his associates and the Denning Coal Company were also liable for all of the coal mined out of the Berry tract at twenty-five cents per ton, and rendered a decree accordingly. The court found that the Arkansas Light & Power Company was liable for 28,456 tons of coal mined out of the tract by the Denning Coal Company between June 1, 1918, and March 21, 1919, and also 46,085 tons mined by that corporation itself after it acquired the properties from the Denning Coal Company on April 1, 1919. Appeals have been prosecuted by all of the defendants except Russell and the heirs of Dr. Butts.

It is the contention of learned counsel for appellee that the original decree fixed the extent of the liability of the present appellants, leaving only the quantity and value of the coal to be ascertained, and that, since that decree was affirmed by this court and the determination of the quantity of the coal has been correctly ascertained by the master, nothing remains to be determined concerning that phase of the controversy. We do not agree with counsel as to the effect of the original decree. In the first place, the decree did not attempt, except as against appellant Rye and the other original lessors, to fix the extent of the liability further than to declare that "the defendant, Arkansas Light & Power Company,

is liable to the plaintiff herein for all coal mined from his land, recovered by him in this action, which was done or caused by said Arkansas Light & Power Company or authorized or consented to by it since the 9th day of October, 1916;" and, "defendants Dave McGraw, D. G. Pendergrass and W. J. Pendergrass are liable for coal removed and damage done by the Denning Coal Company which was done with their aid, consent and assistance." It was left open for the master to ascertain what amount of coal had been mined by the Arkansas Light & Power Company or authorized or consented to by it, and the quantity of coal removed by the Denning Coal Company with the "aid, consent and assistance" of McGraw and his associates. But it must be conceded that the original decree as against appellant Rye and as against defendants Russell and the heirs of Dr. Butts, who have not appealed, fixed the extent of liability, for it declared that Rye and the other defendants named were liable to the plaintiff for all coal extracted by the Denning Coal Company and all coal extracted by the Arkansas Light & Power Company. If that decree be found to be conclusive, then nothing remains, so far as determining the correctness of the decree against appellant Rye, but to ascertain the quantity and value of the coal taken out by the Denning Coal Company and the Arkansas Light & Power Company. We are of the opinion, however, that, under well settled principles often announced by this court, that portion of the decree was not final, and that the present appeal of Rye as well as of the other appellants brings up for review the question of the extent of the liability of each for the coal removed. *Davie* v. *Davie,* 52 Ark. 224; *Heffner* v. *Day,* 54 Ark. 79; *Hargus* v. *Hayes;* 83 Ark. 186; *Brown* v. *Norvell,* 88 Ark. 590; *McDonald* v. *Rankin,* 92 Ark. 173; *Sennett* v. *Walker,* 92 Ark. 607; *Stuart* v. *Barron,* 148 Ark. 380; *Robertson* v. *Yarbrough,* 160 Ark. 223.

This court did not, on the former appeal, deal with any question except that relating to the title to the land,

hence the judgment of affirmance was not conclusive as to any other question relating to the liability of the parties. The extent of liability of each of the appellants is therefore open for our determination on this appeal.

First, as to appellants McGraw and his associates in the mining operations conducted by them for the Denning Coal Company. They are liable to appellee for all coal mined by the Denning Coal Company up to June 1, 1918, when they sold their stock and severed their connection with it—not because of the fact that they were stockholders, for merely that and nothing more would not render them liable, but—because the evidence shows that they were the active managers of the mining operations conducted by the corporation, and that they actually participated in the trespass. The removal of the coal being entirely without authority from the owner of the land, all persons who actually participated in the mining operations were liable for the damage done to the owner's property. It is not denied that McGraw and his associates controlled the mining operations for the corporation, and, even though they were acting for the corporation, they were joint trespassers with their principal, the corporation itself, in removing the coal from appellee's land. Those parties were not, however, liable for coal mined after June 1, 1918, when they sold out their interest in the Denning Coal Company and ceased to participate in the activities of that corporation. They were not, after that time, either stockholders or agents of the corporation, and were therefore not liable for any damages caused by the removal of the coal. All that they did was to sell their stock to other individuals and retire from participation in the affairs of the corporation. Nor does the fact that they were original lessees of the mineral rights and transferred their leases to the Denning Coal Company render them liable for coal taken from the mine by a subsequent holder of the lease. An original lessor may be held liable for subsequent acts of trespass committed by lessees or sub-lessees by reason of the

fact that he is asserting ownership of the land, and holds himself out as having authority to authorize the acts which caused the damage. One who merely transfers a lease is not in that attitude, for he is not asserting title to the land itself, but merely is transferring whatever rights he has under the lease. McGraw and his associates were not asserting ownership of the land; they were merely lessees, and all they did was to transfer to the Denning Coal Company whatever rights they had under the lease. As long as they remained participants in the removal of the coal by the Denning Coal Company, they are liable for the damage, but after they ceased to operate the mine they were not liable for the damage done by the Arkansas Light & Power Company, even though that concern held under the lease which had been originally held by McGraw and his associates and assigned by them to the Denning Coal Company. The court erred therefore in its decree against those parties for the 28,456 tons of coal mined by the Arkansas Light & Power Company after March 31, 1919.

Next, as to the liability of Arkansas Light & Power Company: It is conceded by that corporation that it is liable to appellee for the 46,085 tons of coal mined after it acquired the property on April 1, 1919, but it denies liability for the 28,456 tons mined by the Denning Coal Company prior to that time. We do not agree with the contention of counsel for appellee that the evidence is sufficient to show that the power company became a stockholder in the Denning Coal Company when McGraw and his associates sold out on June 1, 1918. Nor do we agree with counsel that, even if the power company had been a stockholder, it would have been liable for wrongful trespass committed by the Denning Coal Company, for there is nothing in the statutes of this State which render stockholders with no other connection with a corporation liable for the debts or wrongful acts of the latter. Nor is there any principle in the law outside of the statutes of this State which imposes any such liability upon stock-

holders in a corporation. The evidence shows, however, that the Arkansas Light & Power Company entered into a contract with the Denning Coal Company on or about June 1, 1918, for the purchase of its output of coal, and it received all of the coal mined by the Denning Coal Company under that contract, and we are of the opinion that this fact rendered the Arkansas Light & Power Company liable to appellee for the value of all coal taken from his mine and delivered to the Arkansas Light & Power Company. Such is the effect of the decision of this court in *Central Coal & Coke Company* v. *John Henry Shoe Co.,* 69 Ark. 302. In that case the court said (quoting from the syllabus), that "where a trespasser wilfully entered upon another's land, and cut and removed timber therefrom, and by his labor enhanced its value, one who innocently purchased the timber from such trespasser will be liable to the owner for the value of the timber with six per cent. interest from the date of the conversion." The court was therefore correct in finding that the Arkansas Light & Power Company was liable to appellee for 74,541 tons of coal mined from appellee's tract of land in controversy.

Coming, then, to the question of liability of appellant Rye, we have reached the conclusion that the court erred in holding him personally responsible for any of the coal mined from the land. He asserted no personal interest in the land and gave no authority personally for anyone else to trespass upon the land. He acted merely in a representative capacity, as guardian appointed by the probate court of the county of the residence of his wards, and in signing the lease he merely undertook to confer whatever rights his wards possessed in the land. All of his authority was derived from his appointment by the probate court, and he was subject to the orders of that court, hence the mere fact of his signing the lease did not render him liable. According to the undisputed proof, he did nothing else. He was not active in the negotiations, and took no part in them except merely

to sign the lease when it was sent to him. His conduct was not such as to either aid or encourage others to commit the trespass, nor did he participate in any other way in the transaction. The money received by him as royalty from the mining of the coal was taken for his wards and not for himself. His act in receiving it was not a personal one, and did not serve as grounds for imposing liability against him for the act of trespass committed by the lessees.

This leaves for determination the question of value of the coal for which the respective parties are liable. The law of this feature of the case has been settled by our decision in the recent case of *Ward* v. *Spadra Coal Co.,* 168 Ark. 853, where we said:

"The measure of damages in an action for unlawfully extracting ore from the premises of another depends upon whether the invasion of the premises was through inadvertence or honest mistake, or was wilful. If the trespass is the result of an honest mistake, the defendant is compelled to pay only the value of the ore as it was when originally in place in the ground. If, on the other hand, the defendant takes out the ore wilfully and intentionally, he must pay the value of the ore as found at the mouth of the mine." Further along in the opinion we said: "It results from the authorities cited above that such value depends upon the position and circumstances of each particular mine, on the quality of the ore, the cost of mining and preparing it for market, its proximity to the places where it is to be used or sold, and on the facilities for transportation."

The effect of that decision is that, where the trespass is wilful and intentional, that is to say, with actual knowledge of the wrongfulness of the act, the trespasser is liable for the value of the coal at the mouth of the mine. But, on the other hand, if the coal has been taken in good faith, without any intentional wrong, the measure of damages is the value of the ore when originally in place in the ground. The decree below was rendered prior to

our decision in the Ward case, but the chancellor seems
to have had the same view of the law in referring the
case to a master, for the direction to the master was to
"find the value of the coal in place at the time of its
severance and removal from plaintiff's land." We are
of the opinion that this direction to the master was cor-
rect under the facts established by the proof in the case,
for the evidence was not sufficient to warrant a finding
that the trespass committed by appellants or either of
them was wilfully or intentionally done. The proof fails
to show that appellants had any knowledge of appellee's
claim to the land up to the time of the commencement
of this suit, but, even as to the coal mined after the suit
was commenced, there is nothing to show that the appel-
lants were not acting in good faith in contending that
they were the rightful owners of the coal, and had the
right to remove it, notwithstanding the pendency of the
litigation. They were not innocent purchasers in the
sense that they were entitled to protection from liability
for the value of the coal, but they were innocent in the
sense that they were not wilfully or intentionally wrong
in taking the coal, and this, as we understand, is the test
prescribed under the law declared by this court in *Ward
v. Spadra Coal Company, supra.* If the master and the
court found that appellants were wilful trespassers,
their conclusions were not supported by the evidence, and
we must test the correctness of the award of damages
by ascertaining from the evidence what the value of the
coal was "when originally in place in the ground." The
amount of royalty as fixed in the lease was intended to be
commensurate with the value of the coal in place in the
ground, and the lease in question fixed the value at ten
cents per ton. Another one of the leases obtained by
appellants McGraw and his associates fixed the royalty
at ten cents per ton, and in still another lease the royalty
was fixed at fifteen cents per ton, but as to the latter there
were other elements of consideration involved. Accord-
ing to the testimony in this case, appellants McGraw and
his associates incurred large expense in opening the mine

on the Bourland place, which served in removing coal from the other two tracts, including the Berry tract. There was no outside opening to the Berry mine, and there were no equipments connected with it except those which were used in the operation of the whole mine which covered the three tracts. Appellants introduced a large number of witnesses, all of whom testified that the value of coal in place in lands in that locality was ten cents per ton, and we are of the opinion that, according to the preponderance of the testimony, that was the true value of coal in place. The testimony introduced by appellee consisted of other leases fixing the value of coal at higher sums, but there is little probative force in that evidence from the fact that the circumstances were not similar, for a mineral lease with accompanying equipments affords no test of the value of coal in place in an unopened mine. According to the testimony in the case, if appellants had not opened the mine on appellee's land, the market value of the coal in place would be ten cents per ton, and the liability could not be enhanced by reason of the fact that the opening on the other land and the equipments connected therewith are available in operating the mine on the Berry tract. If that state of affairs adds to the value of coal under the surface of appellee's land, it is an added value that has been contributed by the appellants themselves, and appellee cannot claim the benefit of it. He must take the value of the coal as it was when the trespass was committed, and not the value added by the opening of the mine by the appellants on an adjoining tract.

There is a further controversy as to the correctness of the decree in favor of appellee against McGraw for the sum of $3,101.80 for rents and value of timber removed after deducting taxes and betterments. There is a conflict in the testimony, but, after consideration, we are unable to say that the decree of the chancellor is incorrect. There is a contention of a clerical error of $432.22 in the calculations, but this difference seems to grow out of the fact that interest was added up to the

date of the decree, at least counsel for appellants have not sufficiently pointed out the error to justify us in reducing the decree. The court in its decree made the following finding with reference to interest:

"That the plaintiff is entitled to interest at the rate of six per cent. per annum on the value of the coal removed during the period from October 9, 1916, to June 1, 1918, beginning with the last named date; that he is entitled to such interest on the value of the coal removed during the period from June 1, 1918, to March 31, 1919, beginning with the last named date; that he is entitled to such interest on the value of the coal removed during the period from March 31, 1919, to March 31, 1921, beginning with the last date; that he is entitled to interest on the value of the timber removed, such interest to be calculated from the date of the decree heretofore rendered on the main issue in this cause, and affirmed by the Supreme Court of this State."

There appears to be no objections made to this feature of the decree, hence it will be adopted in rendering the decree here in accordance with the findings of this court.

The decree against appellant Rye for the recovery of the value of coal mined is reversed, and the cause dismissed as to that feature of the case; the decree against appellants Dave McGraw, W. J. Pendergrass and D. G. Pendergrass is reversed, and judgment will be rendered here against them for the value of 25,632 tons of coal at ten cents per ton, with interest in accordance with the directions in the decree of the lower court; the decree against Arkansas Light & Power Company is reversed, and judgment will be rendered here against that appellant in favor of appellee for the recovery of the value of 74,541 tons of coal at ten cents per ton, with interest computed as aforesaid. In all other respects the decree will be affirmed. The clerk will compute the interest and enter judgment in accordance with the above directions.

HUMPHREYS, J., dissents.