NATIONAL LEAD COMPANY, a Corporation, Plaintiff,

v.

MAGNET COVE BARIUM CORPORATION, a Corporation, Defendant.

Civ. A. No. 871.

United States District Court
W. D. Arkansas,
Hot Springs Division.

July 2, 1964.

Wootton, Land & Matthews, Hot Springs, Ark., W. H. Fogleman, Jr., Houston, Tex., for plaintiff.

Bridges, Young & Matthews, Pine Bluff, Ark., Ward R. Case, Jr., Houston, Tex., for defendant.

JOHN E. MILLER, Chief Judge.

This is a diversity action growing out of an underground mining trespass. The plaintiff, National Lead Company, is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in New York, N. Y. The defendant, Magnet Cove Barium Corporation, was organized and is doing business under the laws of the State of Arkansas.

Plaintiff corporation is the owner or mineral lessee in possession of the following described 40-acre tracts of land in Hot Spring County, Arkansas:

a. NE¼ NE¼, Sec. 15, T 3 S, R 17 W, (hereafter referred to as the "National Lead 40")

b. NW¼ NW¼, Sec. 15, T 3 S, R 17 W,

c. SE¼ NW¼, Sec. 15, T 3 S, R 17 W,

d. SE¼ SE¼, Sec. 10, T 3 S, R 17 W, (hereafter referred to as the "Jernigan 40")

e. SW¼ NE¼, Sec. 15, T 3 S, R 17 W, (hereafter referred to as the "Malvern Lumber Co. 40")

Defendant corporation is the owner or mineral lessee in possession of the following 40-acre tracts in Hot Spring County, Arkansas:

a. NE¼ NW¼, Sec. 15, T 3 S, R 17 W,

b. NW¼ NE¼, Sec. 15, T 3 S, R 17 W, (hereafter referred to as the "Kimzey 40")

c. SW¼ SE¼, Sec. 10, T 3 S, R 17 W, (hereafter referred to as the "Norden 40")

The east line of the Kimzey 40, leased to the defendant, Magnet Cove Barium Corporation, is the west line of the National Lead 40 owned by the plaintiff. The south line of the Kimzey 40 is the north line of the Malvern Lumber 40 on which the plaintiff is the lessee of the

minerals. (See opinion exhibit "A" showing the adjoining 40-acre tracts in the area of trespass and their relative positions to each other.)

(Opinion Exhibit "A")

COMMON BOUNDARY LINE BETWEEN PLAINTIFF'S
AND DEFENDANT'S PROPERTIES

| "NORDEN 40"<br><br>(Leased to Magnet Cove Barium Corp.)<br><br>SW¼ SE¼, Sec. 10 | "JERNIGAN 40"<br><br>(Leased to National Lead Co.)<br><br>SE¼ SE¼, Sec. 10 |
| --- | --- |
| "KIMZEY 40"<br><br>(Leased to Magnet Cove Barium Corp.)<br><br>NW¼ NE¼, Sec. 15 | "NATIONAL LEAD CO. 40"<br><br>(National Lead owns fee.)<br><br>NE¼ NE¼, Sec. 15 |
| "MALVERN LUMBER CO. 40"<br><br>(Leased to National Lead Co.)<br><br>SW¼ NE¼, Sec. 15 | (Leased to National Lead Co.; owned by Malvern Lumber Co.)<br><br>SE¼ NE¼, Sec. 15 |

The plaintiff seeks recovery in its complaint for the removal and disturbance of barite ore lying along its side of the common boundary line of the plaintiff and defendant in the area described as the Kimzey and Malvern Lumber Co. common boundary line. (See opinion exhibit "B".) In plaintiff's original complaint it

(Opinion Exhibit "B")

Cross section of boundary line between "Malvern Lumber Co. 40" and "Kimzey 40", looking west down the property line at the point of crossing of #10 drifts on the 70' and 140' sublevels.

common boundary line

450' ⟨surface⟩ ore body

"MALVERN LUMBER CO. 40" (National Lead)

"KIMZEY 40" (Magnet Cove Barium)

400'

"Removed ore"

350' #10 drift at 140' sublevel

300'

"Disturbed ore body" #10 drift at 70' sublevel

250'

200'

common boundary line 160' level haulage drift

150'

100'

50'

030' level haulage drift

0 (sea level elevation)

(Not drawn to scale)

alleged that the defendant "secretly, knowingly and intentionally and wilfully and without the knowledge or consent of the plaintiff," at a time unknown to the plaintiff, entered and trespassed under the property of the plaintiff by means of underground mining, and mined and removed barite ore belonging to the plaintiff, the total number of tons removed or mined unknown to the plaintiff at the time of the commencement of the suit. In its prayer the plaintiff asked judgment against the defendant and for an accounting of the tonnage of barite ore belonging to plaintiff mined and removed, and for the enhanced value thereof as actual damages; the sum of $10,748.21 for the expenses of an underground survey; and for the sum of $1,000,000 as exemplary damages, together with a permanent injunction.

The defendant in its answer admitted the plaintiff is the owner or in possession of the estate claimed by it and situate as shown in opinion exhibit "A". Admitted that it, the defendant, is the owner or in possession of the estate claimed by it and situate as shown by opinion exhibit "A", and that a common boundary line exists between the Kimzey and National fee 40's and Kimzey and Malvern Lumber 40's. It denied that it at any time knew the exact location of the common boundary line. It denied knowing the amount or quality of the barite ore under the land of the plaintiff. It denied that "secretly, knowingly, intentionally and wilfully and without the knowledge or consent of the plaintiff" it entered and trespassed under lands of plaintiff. It denied that it had mined and removed barite ore in the amount and quality set forth in plaintiff's complaint.

In paragraph 20 of the defendant's original answer it admitted that it "unintentionally by mistake extended a drift across the boundary line for a short distance into plaintiff's property." In paragraph 24 of the defendant's original answer it denied any extension into the plaintiff's property at any point other than those specifically admitted in its answer.

The defendant in its amended answer of January 21, 1964, admitted in paragraph 5 that it made surveys and studies both on the surface and underground to determine the location of the boundary line, but it denied that it knows the exact location of the boundary line at any particular point. It admitted in paragraph 6 that large quantities of valuable barite are present at the common boundary line, but alleged it was without knowledge as to the quantity and value. The defendant further denied any intentional trespass, but it admitted an intrusion across the common boundary line in paragraphs 7 and 8, as follows:

"7. It denies that the defendant, secretly, knowingly, intentionally and wilfully, without the knowledge or consent of plaintiff, entered and trespassed under lands of plaintiff. It states that defendant inadvertently and unintentionally has mined and removed, or displaced and caved, a quantity of barite ore across the common boundary lines and from under lands in the possession of plaintiff. It admits that the total number of tons so mined and removed, or displaced and caved, is known to defendant at the time of filing this amendment, although it was not so known when the defendant originally answered.

"8. It admits knowledge of an inadvertent and unintentional trespass and admits knowledge of the value of the barite ore belonging to plaintiff which has been mined and removed, or caved and displaced, by defendant across the common boundary lines on or under land in the possession of plaintiff."

In paragraph 19 of the defendant's amended answer it admitted the following intrusions across the common boundary line into the plaintiff's property: (a) haulage drifts in waste rock across the common boundary line in 1953 and 1954 to provide space to park mine cars; (b) a scraper drift described as "#10 drift on the 70' sublevel" across the boundary line into the property of the plaintiff,

mostly in waste rock; (c) a scraper drift which displaced 2,442.5 tons of barite ore of the plaintiff across the common boundary line in 1959 described as #10 scraper drift on the 140' sublevel; (d) a scraper drift extension across the common boundary line at the 70' sublevel, which is described as #10 scraper drift at the 70' sublevel which caved or displaced 305.6 tons of barite ore belonging to the plaintiff; (e) several unidentified slusher drifts or stubs which are "a short distance across the boundary line," between the Kimzey 40 of defendant and the National Lead Company 40.

In paragraph 19(j) of the defendant's amended answer it further admitted that 2,838.9 tons of barite ore on the property of the plaintiff, although not mined, is disturbed in such a manner that it cannot be mined. The defendant also admitted in paragraph 20 that it has caved or displaced an additional 5,887 tons of barite ore, for which the defendant offered to pay and tendered $2,295.93, or, in the alternative, to supply 5,887 tons of comparable barite ore at either the plaintiff's or defendant's mining cost, whichever is the lesser.

In paragraph 21 the defendant further denied any other extension into the plaintiff's property at any point other than those set forth above. With respect to the allegations in the plaintiff's complaint as to ore which has been disturbed or displaced and cannot be mined, the defendant in paragraph 22 of its amended answer asserted a contractual agreement of March 30, 1946, as a defense to any claim based upon disturbance of ore at the common boundary line by virtue of the defendant's operations on its side of the common boundary line.

The plaintiff contends there have been numerous intrusions across the common boundary line, beginning at the northeast corner of the Kimzey 40 and extending along the common boundary between the Kimzey 40 and the National Lead fee 40; 17 intrusions across that boundary line and 3 intrusions across the common boundary line between the Kimzey 40 and the Malvern Lumber 40. As a result of these intrusions the plaintiff contends that 18,962 tons of barite ore have been either displaced, disturbed or removed, for which it seeks compensation. The defendant admitted 2,748.1 tons have been actually mined and removed and an additional 2,838.9 tons which are disturbed and nonmineable, or a total of 5,587 tons. The principal difference between the tonnage as claimed by the plaintiff and that of the defendant is the ore below the 140' sublevel which is described as "the disturbed area." This "disturbed area" contains ore which the plaintiff contends has been so displaced or disturbed by the activities of the defendant, both on its side of the line and across the line, that it cannot be mined because of safety hazards and cost considerations.

Thus, the defendant in its answer and amendment thereto admitted several intrusions across the common boundary line of the plaintiff and defendant and the removal of certain quantities of ore belonging to the plaintiff. The case was tried to the court January 27 through February 7, 1964, at which time both parties introduced ore tenus and documentary evidence. At the conclusion of the trial the case was submitted and taken under advisement by the court, subject to the submission of briefs by the parties in support of their contentions, which briefs have been received and considered, along with all the evidence.

The plaintiff contends that the trespass and conversion and disturbance of its ore by the defendant were intentional and wilful, and therefore the measure of damages should be the "mouth-of-the-mine value" of the ore removed or disturbed.

The defendant contends that any crossings of the common boundary line were unintentional and inadvertent, and therefore asserts that the proper measure of damages for the crossings of the boundary line and the removal of the plaintiff's ore is the "in-place value" of the ore removed and for the ore disturbed. Defendant also contends that as to the ore

"disturbed" but not removed, the "mouth-of-the-mine value" measure of damages cannot apply as the ore was not removed and thus not converted to the defendant's use.

Upon the record the court is thus confronted with three questions: (1) the amount of ore belonging to the plaintiff that was removed or disturbed; (a) the wilfulness or innocence of the trespass; and (3) the measure of recovery. In the consideration of these issues the court deems it necessary to set out in some detail the facts as the court finds them, together with a short summary of those findings.

Barite is a non-metallic ore composed of barium and sulphate which usually appears as a colorless or white crystal. Both the plaintiff and the defendant mine and process barite ore, which is used primarily as an additive in oil well muds. The raw ore is "beneficiated," which is a process by which it is mixed with other oil well mud additives to increase its specific gravity. Specifically plaintiff corporation, through its Baroid Division, mines the ore, beneficiates it, and sells its finished product delivered to the well head, together with engineering consultation service in regard to its use and application. Plaintiff's beneficiating plant and equipment at Malvern, Arkansas, together with the mining machinery and equipment situated in the mining area, sometimes referred to as Magnet Cove, are valued in excess of $4,000,000. Plaintiff, National Lead, contends the value of the finished product at the beneficiating plant, f. o. b., is $25.00 a ton. The royalty on the Malvern Lumber Company property mining lease is 50 cents a finished ton, or, based on a 78 percent recovery, 39 cents per crude ton. There appears to be no market at Malvern or anywhere else for the crude ore, and plaintiff beneficiates and sells the finished product through its own marketing system.

Plaintiff commenced its surface mining operations in 1942 in the Magnet Cove area of Hot Spring County, Arkansas. The defendant, Magnet Cove Barium Corporation, commenced its underground development work in this area in 1948, and at the same time was mining the surface on the Norden 40.

In August 1959 the plaintiff discovered a subsidence on the surface near the south boundary line of the Kimzey 40 and the north line of the Malvern Lumber Company 40, and requested that its representatives be given permission to inspect the underground workings of the defendant to determine if any mining had been done across the boundary line of the plaintiff's property. The plaintiff at the time of discovery of the surface subsidence was engaged in open-pit mining and had not gone underground. Subsequently the plaintiff embarked upon a program of underground mining which continues unto the present.

In the underground workings of the parties the horizontal passages are described as "drifts." A drift primarily serves the purpose of removal of the mined ore and access to and from the ore body horizontally. A "manway" is a particular type of drift which is somewhat smaller and is used primarily for access between the ore body being worked and the drifts. Vertical shafts are described as "raises." The horizontal drifts in the defendant's underground workings are classified by levels, beginning with the 160' haulage way level or main level, which is noted as being 200 feet above sea level. (See opinion exhibit "B".) Other levels are measured upward or downward from it and are described as sublevels.

The plaintiff in its underground mining operation engages primarily in what it describes as the "square set" method of mining.[1] This method of mining consists primarily of constructing square frames of railroad ties which are

1. The court in its study of the mining methods used by the parties and the terms describing them finds many common characteristics which make it difficult to distinguish between the various mining methods used.

set in the mining tunnel as support for the earth that is removed. Two other mining methods which are described by the plaintiff as the "top slicing" and "pillar caving" methods are not used by it.

■ In the defendant's underground mining operation it uses what it describes as the "pillar caving" method in combination with stoping and drawing. It occasionally engages in the method of mining described as "top slicing." Top slicing is accomplished by extending "fingers" out from the drifts into the area to be mined in which charges of dynamite are placed. The ore is broken by the explosion of the charges in succeeding horizontal layers, which causes it to break and fall creating a stope, from where it is drawn down into the drift and removed. Small manways are constructed on each side of the drift to service the haulage drift and to provide access to the area where the ore has been blasted and driven down into the stope. Top slicing is thus a method of mining an ore body downward by successive removal of horizontal slices.

Another method by which ore was removed at the common boundary line is by the extension of pull holes which are small shafts extending from the sides and ends of the drift through which ore is drawn down after having been blasted and cracked in the area above the end and sides of the drift. It is by this method that the defendant removed that portion of the ore across the common boundary line which lay above the end of the defendant's drifts. The removal by blasting the ore across the common boundary line and drawing it down into the defendant's drifts also disturbed, fissured and cracked remaining ore in the same body of this area which remains across the common boundary line.

■ The mining method referred to as "block caving" consists of the extension of a drift under a block of ore, which is blasted and drawn down into the drift. The ore body is reached through small extensions (fingers) from the sides of the drift up and into the ore body. Within these fingers are placed dynamite charges which crack the ore and drive it down into the drift.

■ Pillar caving (the method in which the defendant is primarily engaged) consists of extending small drifts from the ends and sides of the haulage drift. At the end of these tunnels larger openings or rooms are blasted, which are referred to as stopes. These areas at the ends of the drifts are extended by blasting the sides and the ceiling and removing the broken ore back through connecting tunnels to the haulage drift. The creation of the cave or room, which is created by the removal of the ore, is characterized as a stope, hence the name stoping for the process of blasting and removing the ore.

The intrusions across the common boundary line at the Kimzey and Malvern Lumber 40's are primarily at the 70′ sublevel and the 140′ sublevel of the defendant corporation's underground mining operation. (See opinion exhibit "B".) Stope records of the #10 drift at the 70′ sublevel indicate that it extends 22′ across the common boundary line into the ore belonging to the plaintiff on the Malvern Lumber 40. Stope records of the defendant also disclose that drift #9 at the 70′ sublevel contained a stope which extended 5′ across the common boundary line into the ore of the plaintiff on the Malvern Lumber 40. There are also various other intrusions across the common boundary line into the Malvern Lumber 40 at the 70′, 119′, 140′ and 160′ levels. Within this area at the common boundary line ore was caved, mined, removed or disturbed across the boundary line in the Malvern Lumber 40. The ore removed by the defendant from the Malvern Lumber 40 was taken from the area within the 160′ haulage level drift in the 70′ sublevel in drifts #9 and #10, and above the 140′ level in drifts #9 and #10. The ore disturbed by the defendant from the Malvern Lumber 40 lies above the 160′ haulage level drift between the 70′

sublevel and the 140′ sublevel at the ends of the #10 drifts. The ore between the 160′ haulage drift and the 70′ sublevel was mined by pillar caving and blasting stopes. The ore above the 160′ haulage drift was drawn down into the #9 and #10 drifts at the 160′ and 70′ sublevels. The defendant in its answer and at the trial admitted removal of the ore in this area between the 160′ haulage drift and the 70′ sublevel.

On October 5, 1959, Mr. George Schaefer began an underground exploration of the disturbed area at the common boundary line to ascertain the amount of ore disturbed or removed. Mr. Schaefer, a consulting mining engineer, made a joint survey on behalf of the plaintiff and the defendant which resulted in a report describing the area in question, referred to by the parties as the "Schaefer block." The area in question lies at the end of the defendant's 160′ haulage drift in the southeast corner of the Kimzey 40 where it adjoins the Malvern Lumber 40. Mr. Schaefer inspected the #8, #9 and #10 raises at the 160′ level and supervised the drilling of several diamond drill holes. Mr. Schaefer's survey disclosed the ore body as being in an inclined position at the common boundary line with the footwall to the south and the hanging wall to the north as the ore body extends across the common boundary line. The original Schaefer survey disclosed 35,329 tons of ore were removed or disturbed. On the basis of a later calculation after the survey made by the defendant's consulting engineer, J. W. Still, the footwall location was determined to be 5′ north of the point it was located in the original Schaefer survey. This 5′ differential necessitated a revision in the estimated amount of ore removed or disturbed. On the basis of the additional data the Schaefer survey recalculated the amount of ore removed or disturbed to 18,962 tons.

Mr. J. W. Still, a consulting engineer, made an additional survey for the defendant, and he found the footwall 5′ north of the point it was found to be in the original Schaefer survey. Based on his survey, Mr. Still estimated the ore removed or disturbed to be 5,587 tons. He was of the opinion that the ore in the area between the 140 sublevel and the 70 sublevel is still intact and competent. In his opinion the ore in this area could be mined by conventional methods at reasonable cost. In his examination of the affected area he discovered a raise up through a portion of the ore which was accomplished by blasting, and there was no cave-in. The adjusted Schaefer survey with respect to the number of tons removed by the defendant is within 1 percent of the estimate based on the Still survey. Thus, as to the amount of ore which the plaintiff contends it should be compensated for, the amount of ore disturbed presents the major difficulty as the amount of ore removed is estimated by both parties to be almost the same.

Mr. Schaefer was of the opinion that the area characterized as the disturbed ore could not be mined by conventional mining methods with any safety or at any cost. Mr. Still was of the opinion that most of the ore body between the 70′ and 140′ sublevel is quite competent and can be safely mined by conventional mining methods.

██ There are two general measures of damage for trespass to minerals which are described as the "mild" and the "harsh" rules. The "mild" rule applies where the trespass is inadvertent, innocent or not in bad faith, and fixes the damages as the value of the minerals in situ. The so-called "harsh" rule, applied when the trespass is wilful, intentional, or in bad faith, allows the injured party the enhanced value of the product at the time of conversion.

██ Within the framework of the mild measure, there are two different guidelines to determine the in-place value of ore: first, the royalty value whereby the injured party is allowed as damages an amount equivalent to the value of the privilege of mining and removing the minerals; second, another application of

218

the mild rule allows the injured party to recover the value of the minerals after extraction less a credit to the trespasser of its production costs. The effect of allowing the royalty method as damages is not to punish the nonwilful trespasser, but to compensate the injured party for being deprived of the possibility of extracting the minerals. Alternatively, allowing the injured party to recover the enhanced value of the converted minerals with a deduction in favor of the trespasser for the cost of mining them will also compensate for being deprived of the right of mining the minerals and developing them, while preventing the trespasser from profiting from his wrongdoing. When the royalty method is used in applying the in-place measure of damages, the question of allowance to the trespasser of credit for his expenses in producing the minerals is not reached.

 Under the harsh rule the injured party receives an award equal to the enhanced value of the converted property with no credit to the trespasser for his production expenditure, and thus is punitive because of intentional conduct or wilfulness or bad faith in addition to depriving the wrongdoer of any profit from his trespass. Arkansas adheres to the "mild" or "in-place value" measure of damages for trespass and conversion of minerals in good faith. Ward v. Spadra Coal Co., 168 Ark. 853, 272 S.W. 353 (1925); Arkansas Power & Light Co. v. Decker, 179 Ark. 592, 17 S.W.2d 293 (1929). In McGraw v. Berry, 170 Ark. 426, 280 S.W. 383 (1926), quoting from Ward v. Spadra, supra, the court said at page 436 of 170 Ark., at page 387 of 280 S.W.:

" 'The measure of damages in an action for unlawfully extracting ore from the premises of another depends upon whether the invasion of the premises was through inadvertence or honest mistake, or was wilful. If the trespass is the result of an honest mistake, the defendant is compelled to pay only the value of the ore as it was when originally in place in the ground. If on the other hand, the defendant takes out the ore willfully and intentionally, he must pay the value of the ore as found at the mouth of the mine.' Further along in the opinion we said: 'It results from the authorities cited above that such value depends upon the position and circumstances of each particular mine, on the quality of the ore, the cost of mining and preparing it for market, its proximity to the places where it is to be used or sold, and on the facilities for transportation.'

"The effect of that decision is that, where the trespass is willful and intentional—that is to say, with actual knowledge of the wrongfulness of the act—the trespasser is liable for the value of the coal at the mouth of the mine. But, on the other hand, if the coal has been taken in good faith, without any intentional wrong, the measure of damages is the value of the ore when originally in place in the ground."

 The measure of damages for wilful trespass arising out of conduct which is reckless, wilful, or intentional is the enhanced value of the minerals converted at the mouth of the mine without credit to the trespasser for cost of production. The "mouth-of-the-mine value" or "harsh rule" is held to be the measure of damages for a wilful trespass to minerals in the following Arkansas cases: Ward v. Spadra Coal Co., supra; McGraw v. Berry, supra.

The defendant in its brief, in discussing the "harsh rule" measure of damages, calculates its mouth-of-the-mine value with a credit to the wilful trespasser for its mining costs. This is erroneous as a wilful trespasser is not entitled to his mining costs, and thus a true mouth-of-the-mine rule punishes a wilful trespasser by disallowing the mining costs. To allow a credit to the trespasser for its mining costs is an

application of the "mild measure" of damages for a nonwilful trespass as heretofore stated.

As stated in 58 C.J.S. Mines and Minerals § 137, at page 237:

"Where the trespass is an innocent one, as it is where a person by mistake, or unintentionally and in the honest belief that he is exercising a right which he has, enters on the property of another, and takes ore, coal, oil, or other mineral therefrom, the rule supported by the weight of authority is that the measure of damages is the value of the mineral in place, or, as sometimes stated, the value of the mineral extracted from the ore, less the cost of mining and milling. This rule allows the owner compensation for the loss or detriment proximately caused by the trespass; and it neither penalizes the defendant nor allows him a profit."

In 36 Am.Jur., Sec. 231 of "Mines and Minerals," at page 445:

"In some cases, the plaintiff has been held entitled to the value of the coal or other mineral wrongfully mined, without allowing the defendant anything for the cost of digging or severing, for his equipment and facilities used in the trespass, or for breaking or other acts necessary to render the article marketable. A different rule of damages, and one more favorable to the defendant, has been followed by many courts. They deduct the cost of digging or severing the article in cases where the defendant is not chargeable with fraud, violence, or wilful negligence or wrong.[2] The rule of compensation has been variously stated as the value of the coal or other mineral in place; as the value when severed, less the cost of severance; as the value at the mouth of the pit or shaft, less the cost of carriage from the bed thither; or as the value of the ore on the dump after deducting the cost of mining and hoisting the same. * * *

---

"2. Arkansas Power & L. Co. v. Decker, 179 Ark. 592, 17 S.W.2d 293, citing RCL; * * *."

In Arkansas Power & Light Co. v. Decker, 179 Ark. 592, 17 S.W.2d 293 (1929), the court in quoting from 18 R.C.L. 1256 stated at page 598 of 179 Ark., at page 295 of 17 S.W.2d:

" 'The measure of damages recoverable in trespass for the wrongful working of a mine is affected largely by the circumstances of each case, and depends upon whether the wrongful act was done wilfully and with the knowledge of the violation of another's rights, or innocently and through the wrongdoer's mistaken belief as to his rights. It is the prevailing rule that in an action of unlawfully working a mine and extracting coal or ore therefrom, if the taking was not a wilful trespass, but the result of an honest mistake as to the rights of the wrongdoer, the measure of damages is the value of the coal or ore as it was in the mine before it was disturbed. The recovery in such case is limited, first, by the value of what is taken, and second, by the cost of mining, extraction and hauling to the surface. To this is sometimes added the cost of milling, while under other authorities nothing additional is allowed for separating or other acts necessary to render it marketable. Another rule is that, where the trespass is unintentional, the measure of the damages is the value of the mineral in the bed, with the incidental injury to the land. When the wrongdoer commits the trespass wilfully and with the knowledge that he is invading the rights of another, or under such circumstances as to charge him with knowledge of the character of his act, a different rule obtains. In such case the measure of damages is the value of the thing mined at the time of severance without making

deduction for the cost of labor and other expenses incurred in committing the wrongful act; and at times exemplary damages may be allowed in addition to compensatory damages.' "18 R.C.L. 1256."

The plaintiff contends that in addition to the enhanced value of the converted minerals taken by reason of the defendant's wilful and intentional trespass, that it is also entitled to punitive damages in the amount of $1,000,000. The defendant in its brief contends that the enhanced value rule, or harsh rule, is itself a type of punitive damages, and thus the plaintiff cannot recover the enhanced value as well as an award for punitive damages. The defendant also contends that a court of equity may not award punitive damages.

■ As heretofore stated, the essential difference in the amount of ore affected by either being removed or disturbed in the Schaefer and Still surveys is in the "disturbed" area between the 140' and 70' sublevels at the end of the #9 and #10 drifts. The court is of the opinion that the evidence conclusively establishes that this disturbed area was so affected by the driving of the drifts, with the attendant blasting and caving, and removal of ore in this area that the remaining ore body on the Malvern side of the common property line between these two sublevels is not capable of being mined at any reasonable cost or safety. Not the least of the court's considerations is the increased danger that the plaintiff's personnel would be subjected to in attempting to mine in this disturbed area which contains drifts and stopes, that may yet be undiscovered and not plotted. Although the witnesses for the parties are not in agreement that the ore in this area is softer and more capable of cracking than in the rest of the ore body, yet the ore above the 140' level has been shown to have such a lack of competency in that it continues to crack and descend into the defendant's works because of the blasting and caving in the area around it. Therefore, the court is of the opinion that the calculation of 18,962 tons of ore removed

or disturbed is a proper one. This does not include the 300 tons of ore removed from the east line of Kimzey through intrusions into the National Lead 40, and for which the plaintiff does not ask compensation although the defendant admitted trespassing.

■ The conduct of the defendant's personnel in driving the #9 and #10 drifts at the 140 and 70 sublevels at the common boundary line was done in a negligent manner. The defendant had the engineering capability by virtue of its underground coordinate system to accurately ascertain the common boundary line. Although the court is aware of the principle that the acts of employees and agents of a corporation are by their very nature the acts and conduct of the corporation itself, it cannot be said in the instant case that the conduct of the mining personnel in driving the drifts in question was such a total disregard of the common boundary line and rights of the plaintiff to rise to an intentional wilful trespass. This is not to say that the court approves the apparent lack of supervision of defendant's personnel, or the manner in which the defendant's personnel conducted themselves with respect to the extension of the drifts, or to their subsequent conduct when it became apparent that the boundary line had been crossed. Plaintiff in its brief calls attention to and earnestly argues that certain isolated occurrences through the period 1953–59 establish an intentional violation of the boundary line of plaintiff and defendant. However, such acts, standing alone or in concert, cannot be said to be such a total and callous disregard of the rights of others to be construed intentional and wilful in the sense required to find a wilful trespass. There is no evidence whatever of any conspiracy on the part of the management of the defendant corporation and its mining personnel to commit a trespass across the common boundary line and remove or disturb the plaintiff's ore. Therefore, the court is of the opinion that the trespass was not wilful nor intentional and plaintiff is not entitled to recover general

punitive damages, although the personnel in charge of the mining in this area were negligent in performing their duties.

 The court is also of the opinion that the proper measure of damages is under the Arkansas law the in-place value for the ore removed and disturbed because of an innocent or non-wilful trespass. Within the general principle of the in-place value measure of damages, the court must attempt to place the injured party in such a position as it would have been had not the injury occurred. Of course, this attempt to make the injured party whole is the underlying basis for compensatory damages. As to a landowner who has not the opportunity nor the equipment to develop minerals, the amount for which he can lease them, or royalty value, is the generally accepted measure of damages as to him for an innocent trespass and conversion of minerals. However, as to the mineral lessee with the desire, ability and facilities to mine and develop minerals, the royalty value does not adequately compensate him for being deprived of the opportunity to exercise his mining rights. To place the mineral lessee in the position that he would have been had the injury not occurred is to at least compensate him for the net amount he would have realized by the exploitation of his mining rights as determined by the particular facts and circumstances of each case. The court has no desire to "punish" the defendant corporation, but at the same time it must not allow a trespasser to profit from his own wrongdoing. Thus, the court is of the opinion that the in-place value as to a mining lessee, such as the plaintiff here, is the enhanced value of the ore with a credit to a nonwilful trespasser for its costs.[2] By this approach the plaintiff mineral lessee is put in the place it would have been had it not been deprived of the opportunity of mining its ore, while at the same time depriving the trespasser of any profit from its wrongdoing, but yet inflicting no punishment on the trespasser by the allowance of its expenses or costs in removing and developing the ore.

 There is no evidence to justify the court's retaining jurisdiction or imposing an injunction on the defendant with regard to future mining operations, as the court is confident that the defendant in good faith will comply with its judgment and will take precautions in the future to insure the fidelity of the boundary line.

As to the disturbed ore which remains at the boundary line on the Malvern Lumber Company 40, the defendant contends that a 1946 agreement between plaintiff and defendant is a bar to any cause of action arising out of disturbance to, or, because of subsidence, cracking and fissuring.[3] This agreement in paragraph 12 stated:

"12. It is understood that Magnet [the defendant] intends to engage in underground mining operations on

2. The defendant asserts the value of beneficiated barite delivered to the purchaser at the well site is between $41 and $46 per ton, which is a price competitive with that of the plaintiff. The milling cost is stated to be $4.70 per ton. The profit per ton is asserted by the defendant to be $6.61. The president of the defendant testified the wholesale price of beneficiated barite, f.o.b. Malvern, is $20.25 per ton. Based on a 78 percent recovery factor the crude ore is thus worth $15.80 per ton. Subtracting the milling cost of $4.70 per ton, the value of the ore at the mouth of the mine is thus $11.10 per ton. A credit to the defendant of mining costs at $4.49 per ton reduces the value of the ore at the mouth of the mine to an in-place value of $6.61 per ton. (18.962 tons @ $6.61 per ton = $125,338.82)

3. On October 31, 1945, the present plaintiff filed its complaint, Civil Action No. 216, in this court against the present defendant, in which the plaintiff sought to recover from defendant the sum of $25,069.80 with interest; for a permanent injunction restraining defendant from using a roadway or otherwise interfering with the use by plaintiff of the NE½ NE¼ of Sec. 15, National Lead Company 40; from piling waste and other overburden from its mining operations; and be required to remove its shops, structures and erections on the NW½ NE¼ of Sec. 15, Kimzey 40. The defendant

its property, and that such operations may cause subsidence, cracking, or fissuring of the lands of National adjacent thereto, and National hereby waives any claim for damages on account thereof, or resulting therefrom."

The court is of the opinion that the 1946 agreement is not ambiguous. By virtue of paragraph 12 the defendant is not liable for its underground operation on its side of the line which caused subsidence, fissuring or cracking of the adjacent property across the line. But this does not bar the plaintiff from recovering from the defendant for conduct which it engaged in across the line whether it removed or disturbed ore belonging to the plaintiff.

Although the 1946 agreement by virtue of paragraph 12, which the defendant alludes to, might relieve it of the duty to provide lateral support at the common boundary line, it does not give it the right to cross the common boundary line and to engage in mining operations across the common boundary line, and to remove or disturb ore belonging to the plaintiff.

The plaintiff also contends that the defendant should be held liable for the cost of the Schaefer survey. The evidence establishes that the parties originally agreed to share the cost of the survey by some engineer, but apparently Mr. Schaefer was selected by plaintiff without the express approval of the defendant and cooperation between the parties practically ceased. The Schaefer survey was not made available to the defendant until a short time prior to the trial of the instant suit. The defendant, of necessity, employed an engineer of its own selection, Mr. Still, to make a survey, for which it bore the entire expense. In these circumstances the court does not feel justified in assessing against the defendant any part of the cost of the Schaefer survey.

Therefore, a decree is being entered today granting the plaintiff judgment against the defendant in the sum of $125,338.82 for the removal or disturbance of 18,962 tons of barite ore, based on a raw ore recovery factor of 78 percent, together with interest thereon at the rate of 6 percent per annum from date of judgment; denying the plaintiff's prayer for punitive damages; denying the plaintiff's prayer for recovery of expense of the Schaefer survey; denying the plaintiff's prayer that the court retain jurisdiction of the parties and controversy; and denying the plaintiff's prayer for a permanent injunction.

filed its answer and two counterclaims on November 30, 1945. By amendment to the complaint filed February 27, 1946, the plaintiff sought to recover an additional sum from defendant for damage alleged to have been caused by defendant trespassing upon the said Kimzey 40 and piling additional overburden thereon.

On April 23, 1946, the parties executed and filed a stipulation for dismissal with prejudice of the complaint, the amendment thereto, the answer and counterclaims. The agreement between the parties for dismissal and settlement of the action was evidenced by written contract entered into by the parties.

At the time the 1945 suit was commenced the plaintiff was the owner of the surface estate in the Kimzey 40, while the defendant was the owner of the barite ore. At that time the plaintiff was the owner of a mineral lease on the Malvern Lumber Company 40 and owned the fee simple title in the National Lead 40. Both parties were engaged in strip mining, and had entered into a contract on January 10, 1945, by the terms of which the plaintiff agreed to remove the overburden from the southeast corner of the Kimzey 40, and the defendant agreed to pay the plaintiff a certain price per yard for removing the overburden. The plaintiff also had granted the defendant the right to use a roadway across its National Lead Company 40 for the removal of the ore from the Kimzey 40.

Under the terms of the 1946 settlement the defendant paid plaintiff the sum of $25,069.80. The plaintiff conveyed to the defendant all its right, title and interest in the Kimzey 40, along with other land. The defendant granted to the plaintiff a right of way for haulage roads on and across the Kimzey 40. The stipulation also dealt with and covered other matters not material in the instant case.