Larry PENIX, Appellant

v.

Barbara DELONG, Appellee

2014–SC–000083–DG

Supreme Court of Kentucky.

RENDERED OCTOBER 29, 2015

COUNSEL FOR APPELLANT: Kyle Ray Salyer

COUNSEL FOR APPELLEE: Ronald Eric Mills

## OPINION OF THE COURT BY JUSTICE CUNNINGHAM

This is a timber case. It centers on the question of how much, if any, a landowner is insulated from liability by the employment of an independent contractor employed to cut timber. This includes the issue of civil liability of any kind, but most importantly the exposure to the treble damage provision of KRS 364.130 when the contractor trespasses on adjoining land and cuts timber.

Larry Penix, an Ohio resident, owned land in Martin County, Kentucky. His land adjoined Barbara Delong's property. Penix had his boundary line surveyed by Westek Development, Incorporated, and the line was marked with flags and stakes. Penix then entered into a contract with a logger, Joe Hunt, Jr., to cut timber on his property. Hunt was to pay Penix a royalty on the timber sold and was to have complete control over the timber work. A cousin of Penix, William Penix, walked the boundary line with Hunt, pointing out surveying markings. In the course of cutting timber over the next several months, Hunt trespassed on the property of Delong and cut and sold a substantial amount of timber on her property. Delong subsequently sued Penix for trespass, seeking damages for the missing timber and the damage to the land. The case was tried without a jury. The trial court found for Delong and awarded stumpage value and damages, but declined to award treble damages because it found that Penix had no intent to remove timber from the Delong property. The trial court awarded Delong damages in the amount of $48,709.

Delong appealed the trial court's ruling on the sole issue of whether she was entitled to treble damages under Kentucky Revised Statute ("KRS") 364.130. A cross-appeal was filed by Penix arguing that

since Hunt was an independent contractor, he—Hunt—is solely responsible for his tortious trespass.

The Court of Appeals vacated the circuit court's ruling on treble damages and costs and remanded for additional findings and further proceedings. The Court of Appeals affirmed on the cross-appeal by Penix, finding that he is liable for the damages caused by the trespass and cutting of Delong's timber. We granted discretionary review.

**Standard of Review**

The appropriate standard for the review of the circuit court's findings is not to reverse unless they are clearly erroneous. In order for us to reverse, there must be no substantial evidence to support the trial court's ruling. *Croley v. Alsip,* 602 S.W.2d 418 (Ky.1980). If believed to support the respective positions, the findings of the trial judge are not clearly erroneous. *Hensley v. Stinson,* 287 S.W.2d 593 (Ky. App.1956). Matters of law are reviewed *de novo. Caesars Riverboat Casino, LLC v. Beach,* 336 S.W.3d 51 (Ky.2011).

**1. Liability**

We first address Penix's appeal of the trial court's finding of his liability for the cutting and selling of Delong's trees.

There is no serious dispute that there was a trespass upon Delong's property and many trees cut, nor has there been any challenge to the amount awarded. Penix contends that the trial court erred in not granting summary judgment as to Hunt's status as that of an independent contractor. The liability of the employers for the acts of independent contractors is usually limited to those instances where the contractor engages in activity which constitutes a nuisance or is inherently dangerous. *Clemons v. Browning,* 715 S.W.2d 245, 246 (Ky.App. 1986). Penix's claim is misplaced. The

trial court did in fact find that Hunt was an independent contractor. However, he further found that Penix was responsible under the logging agreement for the property line. Said the trial court: "[T]he Court concludes as a matter of law, that although logger Joe Hunt, Jr., was an independent contractor, that fact does not absolve the Defendant Larry Penix from liability to the Plaintiff in view of Defendant Penix's participation, both directly and indirectly through his first cousin William Penix in advising and instructing the logger where to cut timber." Even though Hunt was an independent contractor, the timber contract required Penix to "be responsible for the property line." It is true that an employer is usually not liable for the tortious acts of an independent contractor. *See Nazar v. Branham,* 291 S.W.3d 599 (Ky.2009). However, the employer still remains bound by the terms of the written contract. Therefore, Penix maintained control and responsibility in establishing the proper property line. There is ample evidence that Penix's cousin, William Penix, acted as his agent in showing the line to logger Hunt. William Penix's name was on the logging contract as a witness, and his name and phone number were listed on the document as the person Hunt could contact regarding the job. It was also clear from the evidence that William Penix acted as Penix's agent when walking the line with Hunt. William Penix also walked the land with the surveyor.

The evidence abounds in confusion as to what exactly William Penix pointed out as the property lines. There were three types of markings on the ground. William Penix testified as to ribbons which marked "working stations." There were also ribbons which marked "boundary trees." Then there were actual boundary stakes.

It appears from the evidence that William Penix was either mistaken as to his own understanding of what the markings meant, or failed to ascertain a proper interpretation of the ribbons and the markers. Therefore, there was ample evidence for the trial court to find that on the walk of the boundary line with Hunt, William Penix, the agent of Penix, was negligent in properly establishing the correct boundary line with the logger Hunt. Therefore, there was substantial evidence to support the trial court's finding that the agent was negligently mistaken in pointing out the boundary line. It is clear from the testimony that William Penix was not trained or skilled in surveying, nor interpreting boundary markers. One must remember also, that the parties were engaged in litigation over two large tracts of uninhabited and rugged terrain of steep hills and a thick forest of timber. There was sufficient evidence that the boundary line was wrongfully, but unintentionally, interpreted by Penix's agent. Therefore, we hold that the trial court's finding, in regard to both denying the summary judgment and directed verdict, was not clearly erroneous. We affirm that portion of the opinion of the Court of Appeals holding Penix responsible for Delong's timber.

### 2. Treble damages

Penix also appeals the Court of Appeals' opinion reversing the trial court's refusal to award Delong treble damages under KRS 364.130.

KRS 364.130 states as follows:

(1) Except as provided in subsection (2) of this section, any person who cuts or saws down, or causes to be cut or sawed down with intent to convert to his own use timber growing upon the land of another without legal right or without color of title in himself to the timber or to the land upon which the timber was growing shall pay to the rightful owner of the timber three (3) times the stumpage value of the timber and shall pay to the rightful owner of the property three (3) times the cost of any damages to the property as well as any legal costs incurred by the owner of the timber.

■ There was no evidence that Penix took any steps which would have relieved him from liability under this statute. KRS 364.130(2)(a). This is a penal statute, substituting treble damages for punitive. It is neither a strict liability statute, nor an automatic measure of damages when the cutting of timber has been unlawful.

The evolution of the wording of this statute is critical to this case. Prior to 1994, it simply stated that "any person who unlawfully enters upon and cuts ... shall be liable to the rightful owner of the timber in punitive damages." The current law consists of two major changes. First, and most importantly to this case, is the requirement of "intent to convert." The second major change is substituting treble damages for punitive damages.

Under the old statute, simple conversion was sufficient for the awarding of punitive damages. That is because a person "who mistakenly believes that his or her conduct is legal may nonetheless commit conversion." 18 Am.Jur.2d Conversion § 3. (Citations omitted).

■ Although conversion is an intentional tort, the old statute did not require the *intent* to convert. Contrary to the assertion of the dissent, we do not "lock our gaze" on the word *convert*. It is the word *intent* which is pivotal. The dissent also misses our point entirely by incorrectly stating that the only change from the old statute was to impose punitive damages. The change also, and importantly, added the requirement of intent. After

missing this critical road sign the reasoning of the dissent quickly heads down the errant road of strict liability. It is this independent element of intent that makes this case distinct from the type of wrongdoing required to prove conversion or punitive damages. "In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety, or property of others." *Gibson v. Fuel Transport, Inc.,* 410 S.W.3d 56, 59 (Ky.2013). *See also Phelps v. Louisville Water Co.,* 103 S.W.3d 46, 52 (Ky.2003). Intentional wrongdoing is now a statutory requirement for the awarding of treble damages. The statute itself raises the threshold of penal damages from the common law penalty for trespass and conversion where mere recklessness might justify punitive damages. Reckless conduct may constitute a willful trespass. *Sandlin v. Webb,* 240 S.W.2d 69 (Ky.App.1951); *see also Harrod Concrete and Stone Co. v. B. Todd Crutcher,* 458 S.W.3d 290 (Ky.2015). Our interpretation of KRS 364.130 concludes this matter since we have previously held that "the common law, prior statutes and the public policy growing out of them all must yield to the superior authority of a later enacted statute...." *Meece v. Feldman Lumber Co.,* 290 S.W.3d 631, 633 (Ky.2009).

Why the proof for penal damages with timber is treated differently than other natural resources is an interesting question, but not germane to our decision.

Delong argues that the only way a trespassing party can escape treble damages is

"if, and only if," they comply with KRS 364.130(2). That provision specifically outlines steps the trespassing party can take to avoid liability under that statute. That argument, however, requires us to completely skip over and ignore the requisite elements necessary in KRS 364.130(1) to hold a trespasser liable for treble damages in the first place.

There are two key words in this statute which must be given their ordinary meaning. A fact finder must first determine that the trespassing party caused the cutting of the timber with the "intent" to "convert." Those facts were not found by the fact finder in this case.[1]

There is no question that the contracting by Penix with Hunt to cut timber on his property was at least an indirect cause of timber being cut on Delong's property.

However, the trial court determined that as a matter of law, the statute requires Penix to have caused the timber to be cut "with intent to convert to his own use the timber growing upon the land of another without legal right." We agree.

We need not dwell upon the meaning of the word "intent" but only to fully recognize it as a state of mind. There must be a specific intent here to do wrong. That wrong that the fact finder must find is that Penix intended to convert the timber.

"Conversion" is defined by Webster's New World College Dictionary as *"unlawful* appropriation or use of another's property, resulting in deprivation of ownership rights." (Emphasis added) Webster's New World College Dictionary, (5th ed.2014). Black's Law Dictionary defines

---

1. The dissent enters into the fact finding role by concluding that Penix "intended to convert Delong's trees to his own use." Ironically the author of this dissent wrote in his dissent in *Meece,* "I believe the majority engages in appellate revision rather than appellate review by doing its own fact-finding. The trial court had direct contact with the evidence in this case, and we should defer to the trial court as the fact finder."

"conversion" as "an *unauthorized* assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights." (Emphasis added).

■ To interpret the statute to read that only the unauthorized cutting of the timber itself must be intentional is to make the language totally meaningless and unnecessary. To do so, would make it a strict liability statute. It is impossible to unintentionally cut a tree. We hold that the trespasser must have intended to cut timber which he knows he is unauthorized to cut.

The trial court found that there was insufficient evidence to prove that Penix intended to convert Delong's timber for his own use, or more precisely, royalties.

■ We must therefore review the evidence to determine if this finding by the trial court is clearly erroneous. We cannot find it to be so.

While there was evidence for the trial court to conclude that William Penix was the agent in pointing out the property line to Hunt—and in that activity may have been negligent—it was surely not erroneous for the trial court to find the lack of intent to convert on behalf of Penix. There was evidence that Penix was a non-resident of Martin County, Kentucky, interested in having his property timbered. He had it surveyed for the purpose of having it timbered. It was an act which in and of itself indicates good intention of respecting adjoining property lines. This expensive precaution is usually not found in the stealthy bag of tricks of a timber thief. Penix then contracted with Hunt as an independent contractor to cut the timber. According to Penix, he cautioned Hunt to be sure and stay within his property lines. While that agreement required

Penix to be responsible for the property line, it did not in any way impose responsibility for Hunt's trespassing across that boundary.

Delong's son, Gerald Delong, testified extensively about his involvement in discovering the damage to his mother's property and his discussion with Penix afterwards. Gerald and Penix first met at the site of the cutting after the trees had been cut. There was a heated exchange which took place because Penix denied that he had trespassed upon the Delong property. Disturbed by the prospects however, Penix went to the courthouse to re-examine the deeds to either disprove or confirm the trespass. There he met—apparently by coincidence—Gerald and they discussed the matter in a much more civil manner. Then convinced there had been a trespass, Penix assured him that it was an honest mistake. Gerald apparently believed him as they concluded the conversation by shaking hands. Penix advised Gerald that the surveyor had told him that the property line was where the ribbons were located and that he was going to sue the surveyor.

Deputy County Court Clerk of Martin County, Tammy Harriston, testified of over-hearing the conversation between Gerald and Penix in the County Court Clerk's office. In that conversation, she heard Penix say it was a mistake and the fault of the surveyor.

■ It appears that the only evidence of any intent on Penix's part to trespass and take the timber of Delong was in the alleged statements that Hunt made to Gerald. Over the objection of Penix, the trial court allowed this statement into evidence. It is this evidentiary ruling that is part of Penix's appeal in this case. Gerald was permitted to testify that Hunt, then deceased, told him that when he became concerned that he might be crossing the

boundary line, Penix told him to "keep cutting."

We are inclined to agree with Penix's position that the evidence was inadmissible hearsay. We find that the trial court erred in admitting the evidence under the admission against interest pursuant to KRE 804(b)(3). The Court of Appeals, in allowing the evidence, reasoned that Hunt, as "an experienced logger," knew his statement would have exposed him to liability for trespass. However, it would appear that the statement, far from being a declaration against interest, was shifting liability to Penix. There was never any doubt of who actually cut the trees. Therefore the proponent of the statement—Delong—failed to meet her burden that the declarant Hunt, knew his statement was against interest when he made it.

Penix denied any such conversation took place. In fact, he testified that he and logger Hunt never had a conversation concerning the boundary line once Penix gave him the written survey done by Westek Development, Incorporated.

The evidentiary ruling of the trial court, if error, was inconsequential, however. The trial judge gave it very little weight in determining the issue of treble damages.

The court stated: "[t]here was some indication that logger Hunt questioned the Defendant as to the location of the lines when he was in the middle of cutting the timber, but one must recall that logger Hunt is now deceased. That testimony was quoting logger Hunt, who is not subject to direct or cross examination."

It was clear that Penix, an absentee owner, was only vaguely familiar with the contours and exact extent of his property ownership, and relied solely on the survey. He testified that he had never walked around the boundary of the property. In fact, he did not even know that Delong owned the adjoining property. He thought it belonged to George Penix.

It might appear bizarre that such a large swarth—eighty to ninety acres—of Delong's timber was cut by mistake. However, both Penix and his agent, William Penix, were residents of Ohio, who were not regularly on the large wooded area being timbered. Nor was Penix ever on the land while the timber was being cut.

It becomes clear in reviewing the evidence that the misreading of the ribbon markings was the source of the confusion as far as where the boundary was located. Both Penix and his cousin, William Penix, were of the opinion that the ribbons marked the boundary, where in truth, it now appears, all of them did not. Therein, lies the reason that Penix and his agent—unschooled in surveying methods and unfamiliar with the lay of the land—caused the mistaken timbering of Delong's timber. At the very least, the trial court was not clearly erroneous in so finding.

The Court of Appeals erroneously relied on *Meece*. In that decision, we were addressing strictly a "color of title" claim which we determined did not remove the trespasser's liability for treble damages. This is not a "color of title" claim. There are no competing deeds, nor pending quiet title suits attempting to resolve the proper boundary lines. No one disputes who had legal title to the property trespassed upon. The trespass by Hunt upon Delong's property is clearly known.

We simply hold today that when a landowner has engaged an independent contractor to cut timber, there must be some evidence that the landowner—not the logger—*intended* to "convert to his own use timber growing upon the land of another." The trial court found that while there may have been negligence of an agent in establishing the boundary line,

there was insufficient evidence to impute to the landowner intent to convert. In reviewing the evidence presented to the trial court, we do not believe it was clearly erroneous in its findings. Therefore, the measure of damages correctly used by the trial court was the fair and reasonable market value of the timber at the time it was cut—or "on the stump." *Gum v. Coyle*, 665 S.W.2d 929 (Ky.App.1984).

Therefore, we uphold the Court of Appeals in its affirming the trial court in the determination that Penix was liable for damages for trespass but reverse the Court of Appeals in determining that Penix was subject to treble damages under KRS 364.130. The order and judgment of the trial court is hereby reinstated.

All sitting. Barber, Keller, and Venters, JJ., concur. Minton, C.J., dissents by separate opinion in which Abramson and Noble, JJ., join.

MINTON, C.J., DISSENTING:

Missing the forest for the trees, the majority locks its gaze on the meaning of the timber statute's use of the word *convert*, causing the majority to launch into an unnecessary discourse on the common law tort of conversion and ultimately rewrite the law to the lasting detriment of inno-

cent victims of timber piracy. To me, this case is simple: Penix did more than simply intend to cut Delong's trees. He intended to convert Delong's trees to his own use, *i.e.*, take them for his own commercial gain. And Penix acted without the statutory mitigating circumstance of any colorable claim of title to Delong's property. So Delong is entitled to treble damages under our statute because she is the rightful owner of the trees taken from her land and sold by Penix for his profit.

I find it important to start with a general reminder that KRS 364.130 is not now nor has it ever been a conversion statute. Instead, it is a statute based in trespass.[2] At common law, timber pirates were guilty of *trespass quare clausum fregit* : "an action for invasion of possession of realty."[3] These pirates were then liable to the rightful owner of the stolen trees for a measure of damages equal to the loss in value caused to the property taken at the point of their blade. This historic legal principle did not change with the enactment of KRS 364.130 in 1956.

The majority's analysis hinges on the General Assembly's 1994 amendments to KRS 364.130, the first substantial revision to the statute since its enactment in 1956. More specifically, the majority focuses on

---

**2.** It seems the majority agrees with this proposition—at least at times. For example, in response to Delong's argument regarding subsection 2 of KRS 364.130, the majority states on page 614: "That provision specifically outlines steps the *trespassing party* can take to avoid liability under that statute. That argument, however, requires us to completely skip over and ignore the requisite elements necessary in KRS 364.130(1) to hold a *trespasser* liable for treble damages[.]" (emphasis added). *See also* slip op. at 611 ("Delong subsequently sued Penix for *trespass*, seeking damages for the missing timber and the damage to the land.... The Court of Appeals affirmed on the cross-appeal by Penix, finding that he is liable for the damages caused by the

*trespass* and cutting of Delong's timber.") (emphasis added).

**3.** BRIAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE (3d ed.2011); *see Kentucky Stave Co. v. Page*, 125 S.W. 170 (Ky.1910) (discussing the legal reasoning supporting the treatment of timber piracy as trespass *quare clausum fregit*); *see also* BLACK'S LAW DICTIONARY (10th ed. 2014) ("A person's unlawful entry on another's land that is visibly enclosed ● This tort consists of doing any of the following without legal justification: (1) entering on to land in the possession of another, (2) remaining on the land, or (3) placing or projecting any object on it.").

the General Assembly's decision to add "intent to convert" to the statute.

Only a few years ago, in *Meece v. Feldman Lumber Co.*[4]—a case summarily rejected by the majority—this Court found these same 1994 amendments merited little attention, stating: "A comparison of the 1994 changes to the earlier version of KRS 364.130 reveals *the only major change* was to substitute 'triple damages' for 'punitive damages' in the case of a trespass without color of title."[5] The majority in *Meece* was right about that point—the substitution of treble damages for punitive damages was the only major change to KRS 364.130 in 1994. Most importantly, I do not believe there is any support for the notion that the General Assembly intended in 1994 to transform KRS 364.130 into an action for conversion, effectively turning its back on more than a century of common and statutory law.[6]

The "intend to convert" language may be a curious insertion into the statute, but we should not over-read it. After all, our task when interpreting statutes is to give effect to the plain meaning of the language used by the General Assembly—nothing more, nothing less.[7] *Convert, in* its ordinary sense, is defined as "to change (something) into a different form so that it can be used in a different way"; "to alter for more effective utilization"; or,

perhaps more aligned with the majority's view, "to appropriate without right."[8] Embarking on a discussion of the requisite elements of the intentional tort of conversion is unnecessary to understand the ordinary meaning of our statute. Giving *convert* its ordinary meaning, I am baffled by the argument that Penix did not convert Delong's timber for his own use. Penix cut the trees and sold them for profit, *intentionally.*

My reading of KRS 364.130 is not novel. In fact, the Court of Appeals adopted the same reading in *Seals v. Amburgey.*[9] There, the court found it was "undisputed that Danny Seals entered into a verbal contract with Dove Logging, LLC[,] to cut and remove standing timber from an area of property as designated by Danny Seals.... [And,] Seals was to be paid 25% of the sale price for the timber cut and removed by Dove Logging, LLC[,] under this agreement."[10] The impact of this was clear to the appellate court because it could "not see how the [Sealses] can argue there was no evidence that the [Amburgeys] had any intent to convert the timber to their own use."[11] The [Sealses] intentionally converted the Amburgeys' timber to their own use much like Penix did here.

The majority rejects this approach because "[i]t is impossible to unintentionally

---

**4.** 290 S.W.3d 631 (Ky.2009).

**5.** *Id.* at 635 (emphasis added).

**6.** And, I should add, I do not subscribe to the view promoted by the majority that "[u]nder the old statute, simple conversion was sufficient for the awarding of punitive damages" because I do not believe KRS 364.130 has ever been a conversion statute. Op. at 613.

**7.** "We have a duty to accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion." *McElroy v. Taylor,* 977

S.W.2d 929, 931 (Ky.1998) (quoting *Bailey v. Reeves,* 662 S.W.2d 832, 834 (Ky.1984)).

**8.** MERRIAM-WEBSTER DICTIONARY, available at www.merriam-webster.com/dictionary/ convert.

**9.** 2009 WL 3531641 (Nos.2008–CA–002217–MR and 2008–CA–002247–MR Ky.App. Oct. 30, 2009) *discretionary review denied* April 14, 2010.

**10.** *Id.* at *5.

**11.** *Id.*

cut a tree[.]"[12] So KRS 364.130 would be rendered a strict-liability statute. My response to that contention is: so be it. And the argument that it is impossible to chop down a tree unintentionally really misses the mark. Of course, a tree cannot be unintentionally cut down; but our statute says nothing about the intentional *cutting* of the tree.[13] Rather, it focuses on the underlying reason the trespasser cut the tree: did he cut the tree for his own use? In other words, the focus of the statute is not whether the trespasser intends to cut a particular stand of timber but whether the trespasser intentionally takes the trees for the trespasser's own gain.

In any event, the concern that our timber piracy statute suddenly becomes a strict-liability law is fallacious. For decades upon decades, trespass has been a strict-liability tort. The Restatement Second of Torts characterized the strict-liability nature of trespass as follows: "One who intentionally enters land in the possession of another is subject to liability to the possessor of the land as a trespasser, although he acts under a mistaken belief of law or fact, however reasonable, not induced by the conduct of the possessor, that he ... is in possession of the land or

entitled to it...."[14] So as long as the trespasser intended to enter the land, it made no difference whether he believed the land was his or someone else's. As long as Penix intended to convert Delong's timber to his own use, it makes no difference whether he did so under mistaken belief the timber was his or not. Treble damages are appropriate—Penix acted without color of title and did not take any of the steps outlined in KRS 364.130(2) to mitigate Delong's damages. KRS 364.130 has operated in this manner since 1956; and, until today, we have heard no outcries of the harshness of our statute imposing strict liability and exemplary damages on timber pirates.

Of course, I am fully aware that this Court generally operates under the principle that if the General Assembly amends a statute, it must mean something. But "intent to convert" is simply unable to support the weight heaped upon it by the majority. I believe that the General Assembly attempted to clarify a few things in 1994: first of all, willful trespassers, *i.e.*, those satisfying KRS 364.130(1), would be liable for treble damages rather than punitive damages;[15] second of all, innocent

---

12. Op. at 615.

13. The statute ties no mental state to the actual cutting of the tree. Instead, the statute is clear in that it applies to "any person who cuts or saws down, or causes to be cut or sawed down ... timber growing upon the land of another...." KRS 364.130.

14. Restatement (Second) of Torts § 164.

15. We should note that treble damages is not an uncommon penalty for timber piracy—in other words, the General Assembly's change from "punitive damages" to "treble damages" is not at all unique within the statutory provisions for the unauthorized cutting of trees found in the law of sister jurisdictions. Likewise, strict liability—absent color of title or title in fact—is not uncommon. *And* nearly universal is the notion that claims for timber

piracy are based in *trespass*. *See, e.g.*, A.C.A. § 18–60–102 (ARKANSAS) (awarding treble damages *unless* timber pirate has probable cause to believe logged land is his); A.S. § 09.45.730 (ALASKA) (operates similar to Arkansas); Ann. Cal. C.C.P. § 733 (CALIFORNIA) (strict liability with treble damages, unchanged since its enactment in *1872);* V.A.M.S. 537.360 (MISSOURI) (single damages recoverable *only* if timber pirate had probable cause to believe land belonged to him); McKinney's R.P.A.P.L. § 861 (NEW YORK) (strict liability; mitigate damages by showing color of title or title in fact, essentially); 13 V.S.A. § 3606 (VERMONT) (not strict liability, but treble damages); R.C.W.A. 64.12.030 & 64.12.040 (WASHINGTON); W.Va.Code §.61–3–48a (WEST VIRGINIA) (strict liability and treble damages). In our own statutes, more importantly, we see some

trespassers—that is, those who can satisfy the elements of KRS 364.130(2)—may be liable for only the reasonable value of the removed timber. Before 1994, all trespassers in search of timber were liable for punitive damages because there was no provision for mitigation of damages. Likewise, there was no provision outlining any scenario for awarding a measure of damages commensurate with the reasonable value of the stolen timber. The 1994 General Assembly just made clearer the method of awarding damages in a timber case but did not change the fact that stealing timber is a trespass action, steeped in strict liability.

As for the trial court's finding that Penix did not intend to convert Delong's timber to his own use, I would find it unsupported by the evidence and, accordingly, clearly erroneous. In my view, the evidence was clear that Penix intended to convert Delong's timber to his own use. This is especially true, of course, under my reading of KRS 364.130. But this evidence seems clear to me even under the majority's interpretation. It is not as if Penix inadvertently cut down a couple of trees near his property boundary. No, Penix harvested nearly all of Delong's timber. But, in fairness to Penix, he did not harvest *all* of Delong's timber—just all of her good timber. Penix graciously left the lower-grade timber standing for

Delong. If, as the majority holds today, "[i]ntentional wrongdoing is now a statutory requirement for the awarding of treble damages[,]" I would have a difficult time imagining a clearer set of facts than the ones before us to illustrate intentional timber piracy.[16]

Penix ignored patent survey markings indicating the property he rightfully owned. With regard to this evidence, I sound a warning call because today the majority elevates the routine act of obtaining a survey into a safe harbor from treble damages. Ironically, the majority cites Penix's survey as proof that he did not intend to convert Delong's timber to his own use.[17] This, to me, is completely misguided. In my estimation, Penix's disregard for the survey-marked boundaries of his own land is absolute proof that he intended to take timber from Delong. Perhaps it would be different if Penix—an innocent absentee landowner in the eyes of the majority—did not know his boundaries and inadvertently crossed his property line to cut down a few of Delong's trees. After all, property lines are invisible delineations. But, there is the problem: Penix's property lines were visible because he obtained a survey of his land. It makes little difference to me that Penix was unfamiliar with the area and lived out of the state. The point of a survey is to become familiar with a tract of land. The fact that Penix

---

instances of treble damages for trespass. *See, e.g.,* KRS 150.690–.700.

**16.** If the majority opinion is correct in deeming KRS 364.130 a punitive statute and using the standard for punitive damages, I think it abundantly clear that Penix failed to exercise reasonable care and his negligence was accompanied by a wanton or reckless disregard for Delong's property. *See* op. at 613 (quoting *Gibson v. Fuel Transport, Inc.,* 410 S.W.3d 56, 59 (Ky.2013)). I have no trouble finding Penix's egregious conduct met this standard, but I do reject the application of the standard

in this case because the General Assembly has allowed treble damages in place of punitive damages. In other words, treble damages *are* punitive damages with regard to the looting of timber; and the standard cited by the majority, plucked from case law applying our punitive damage statute, has no place in this context.

**17.** "[Penix] had [his property] surveyed for the purpose of having it timbered. It was an act which in and of itself indicates good intention of respecting adjoining property lines." Op. at 615.

had his boundary marked and then crossed that boundary brings me to the exact opposite conclusion of the majority: any argument of inadvertent timber cutting is completely undercut, not bolstered.[18] I think it unwise for this Court to allow surveys to be added to "the stealthy bag of tricks of a timber thief." [19]

Because I would affirm the Court of Appeals and remand the matter to the trial court for imposition of treble damages, I must respectfully dissent.

Abramson and Noble, JJ., join.

---

18. Given my reading of the statute, this conclusion is largely irrelevant because a determination of Penix's intent to convert Delong's timber to his own use does not depend on his mental state in crossing into the Delong property. That said, I do think ignoring a surveyor's clear markings is perhaps grossly negligent for purposes of punitive damages, notwithstanding my objection to applying that standard—see supra, pp. 619–20 n.15.

